## REYNOLDS *v.* STATE

[No. 151, September Term, 1958]

320

*Decided March 18, 1959.*

The cause was argued before HENDERSON, HAMMOND,

PRESCOTT and HORNEY, JJ., and KEATING, J., Associate Judge of the Second Judicial Circuit, specially assigned.

*James A. Ashton* and *Roland Walker,* with whom was *Sheldon A. Rubenstein* on the brief, for the appellant.

*Stedman Prescott, Jr., Deputy Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, J. Harold Grady, State's Attorney for Baltimore City,* and *Norman Polski, Deputy State's Attorney for Baltimore City,* on the brief, for the appellee.

HORNEY, J., delivered the opinion of the Court.

Ethel Reynolds (the defendant) was tried and convicted by a jury in the Criminal Court of Baltimore of three separate offenses concerning prostitution, lewdness or assignation set forth in a "disorderly house" indictment containing eight counts. From the judgment and sentence the defendant appealed.

The defendant operated a physical therapy parlor in Baltimore City. The police, suspecting she was also operating a bawdyhouse or house of ill fame, assigned a police officer to make an investigation. Using an assumed name and wearing plain clothes, the officer made an appointment for a massage which was given by the defendant. On that occasion they discussed out-of-date phonograph records and the officer used that approach to make another contact. A few days later he took a record to the defendant to be tape recorded by her for later use.

When the officer returned to pick up the record he had a conversation with the defendant relative to the number of girls she had working for her. He asked about a red head he had seen previously and was told she was not there, but that a blond was. He was also told that she has two colored girls available, one of whom was older than the other. The officer, stating he was too busy then, indicated he would come back again soon. He did on the next day. About 3:30 in the afternoon he called, made an appointment and returned with other officers who remained outside. There were two

doors at the entrance of the place. One opened into a vestibule. The other, which was kept locked at all times, led into the main part of the house. Upon being admitted by a girl, the investigating officer was met by the defendant who told the girl to go down and get the colored woman. While the girl was gone he made a deal with the defendant and paid her the price she asked in marked bills.

The officer was told to go upstairs. He was joined presently by the colored woman and was requested to undress. The woman did likewise. While she was preparing to perform a perverted sexual act on him, he pretended to go to the bathroom, but instead he grabbed all of her clothing, ran downstairs, and opened the locked door to admit some of the other officers. He then returned upstairs and dressed.

An officer stationed in the rear of the house saw two women attempt to flee but they changed their minds when they saw him. The defendant, when asked for the money which had been paid her, turned her wallet over to the officers who had entered the opened door. They searched the wallet in her presence and found the marked money. When the colored woman was searched by a policewoman she was wearing a street dress and a long leather coat, but no undergarments. When questioned she related how much she was paid to give a massage downstairs and to perform a perverted act upstairs.

A search of the house revealed five packages of prophylactics on a dresser and certain straps, whips, belts, gags, wrist strengtheners and bandages (hereinafter referred to as "paraphernalia") in a closet at the head of the stairs. The defendant claimed that she had purchased the prophylactics three years before for a friend who was getting married and was too busy to buy them for herself. She explained that the paraphernalia had been brought there by a man who wanted to be whipped by the colored woman. When permission to perform the act was refused, he left without taking the paraphernalia with him.

The officers also found a "business" record book, which corroborated what the colored woman had related to the police as to how and when she and other inmates were paid for

their services. While the police were on the premises they also answered two telephone calls. Both were from men and both wanted a massage and the "extra."

The defendant contends (i) that the admission of the paraphernalia into evidence was prejudicial error; (ii) that the instructions of the trial court were erroneous; and (iii) that there was insufficient evidence for the jury to find her guilty under any of the counts.

(i)

The admission of the paraphernalia in evidence was not prejudicial error. On direct examination the police officer testified that he had found them on the premises. Although he described each item, he did not explain or express an opinion at that time as to its use, except to state that one of the whips was used on horses. But on cross-examination, in answer to questions by the defendant, he did express an opinion, based on "things you read and hear," to the effect that the paraphernalia were used in "perverted sexual acts." The defendant contends, because the officer had not been qualified as an expert and had no special knowledge, he should not have been allowed to testify as to their use. She relies on several Maryland cases including *Wilson v. State,* 181 Md. 1, 26 A. 2d 770 (1942), concerning expert witnesses and expert testimony, but none of them are in point here since it was the defendant who elicited the only evidence as to the *use* of the paraphernalia and their connection with her and her "business." The testimony thus obtained was binding on the defendant and became a part of the evidence in this case. *Schanker v. State,* 208 Md. 15, 116 A. 2d 363 (1955). Since there was a direct connection between the paraphernalia and the defendant and the offenses with which she was charged, the evidence was clearly admissible. Cf. *Riley v. State,* 179 Md. 304, 18 A. 2d 583 (1941). Even if there was only a probability that the paraphernalia were connected with the defendant or the offenses charged, they would still be admissible. Inability to show a positive connection would affect only the weight of the evidence and not its admissibility. *Daniels v. State,* 213 Md. 90, 131 A. 2d 267 (1957) ; *Berry*

*v. State,* 202 Md. 62, 95 A. 2d 319 (1953) ; *Edwards v. State,* 194 Md. 387, 71 A. 2d 487 (1950) ; *Jones v. State,* 188 Md. 263, 52 A. 2d 484 (1947) ; *Wilson v. State, supra.*

(ii)

The defendant contends that the trial judge, when he undertook to give advisory instructions, had an obligation to both the jury and the defendant to define and explain the offenses charged in the several counts of the indictment, particularly the difference between such counts and the meaning of the technical words and phrases used therein; and that he had a further duty to state precisely and accurately the essential elements of each offense. She complains that he did neither and that his failure to do so constituted reversible error. Particular stress was laid on the fact that even though the State had abandoned the second count [keeping a disorderly house]—in so far as *this* defendant was concerned—the trial court nevertheless, in pointing out that the paraphernalia were admitted in evidence against her only and not against the colored woman (who did not appeal), continued to refer to the remaining [first, third, fourth, fifth and sixth] counts, which had not been abandoned, as if all of them concerned the keeping of a disorderly house.

The State frankly admits that the trial court did not fully instruct the jury as to the particular offenses charged in the indictment, and that it did not explain the real meaning of keeping a disorderly house or the other offenses charged in the indictment. But, the State insists that because the defendant failed to make a timely objection to the court's instructions, she is precluded from raising the objection here. We must agree. See *Hendrix v. State,* 200 Md. 380, 90 A. 2d 186 (1952) ; *Madison v. State,* 200 Md. 1, 87 A. 2d 593 (1952).

But the defendant, admitting that she did not seasonably object pursuant to Maryland Rule 739 f, insists that this Court should of its own motion invoke the provisions of Rule 739 g and take cognizance of and correct what she asserts is a plain error material to her rights. We do not agree. In this case it is obvious that the errors complained of are such

that the trial court could have—and undoubtedly would have
—corrected if the defendant had interposed her objections, as
she should have done, before the jury retired to consider its
verdict. Cf. *Wolfe v. State,* 218 Md. 449, 146 A. 2d 856
(1958), [error was such that trial court could not have cor-
rected even if it had attempted to do so]. See also *Brown
v. State,* 203 Md. 126, 100 A. 2d 7 (1953), [court was not
afforded an opportunity to clarify or correct misleading impli-
cations].

With respect to the contention that the court's alleged mis-
use of the term "disorderly house" was reversible error, we
need only remind counsel that "[a]t common law a 'bawdy-
house,' or a 'house of ill fame,' in the popular sense of the
terms, is a species of disorderly house." *Henson v. State,*
62 Md. 231, 232 (1884). See also *Beard v. State,* 71 Md.
275, 17 A. 1044 (1889). Cf. *Shaffer v. State,* 87 Md. 124,
39 A. 313 (1898). The law writers also recognize that a
"bawdyhouse" and a "house of ill fame" are frequently in-
cluded in the term "disorderly house." See 2 Wharton,
*Criminal Law,* § 1722 (12th ed. 1932); Clark and Marshall,
*Crimes,* § 11.11 (6th ed. 1958). Contrariwise, a house is said
to be disorderly if it is kept as a bawdyhouse. See Hoch-
heimer (a) *Crimes and Criminal Procedure,* § 611 (1897)
and (b) *Criminal Law,* § 309 (2d ed. 1904). In *Herzinger
v. State,* 70 Md. 278, 17 A. 81 (1889), under an indictment
containing two counts—one for keeping a bawdyhouse and
the other for keeping a disorderly house—the defendant was
convicted of both charges on a general verdict of guilty.

(iii)

At the close of the evidence offered by the State, the defend-
ant moved for an instructed verdict of "not guilty" on each of
the counts in the indictment, but the motion was overruled or
denied. Whereupon the defendant offered evidence on her
own behalf, as was her right, but by so doing, she withdrew
her initial motion for a directed verdict. And, as so often
happens, she neglected to renew the motion at the close of
the whole case.

The jury found the defendant guilty on the first, third and

sixth counts [keeping a bawdyhouse, keeping a place for the purpose of prostitution, lewdness and assignation,[1] and receiving money without lawful consideration from the earnings of a woman engaged in prostitution], and not guilty on the fourth and fifth counts. The second count—and apparently the seventh and eighth counts also—had been abandoned by the State before the charge to the jury.

On this appeal the defendant claims that the evidence was insufficient for the jury to find her guilty as charged under the first, third and sixth counts, but that is a question we do not reach in this case. Since the defendant neglected to renew her motion for an instructed verdict she is without standing to object to the sufficiency of the evidence on this appeal. Maryland Rule 738 a. See also *Briley v. State*, 212 Md. 445, 129 A. 2d 689 (1957), and the cases therein cited. In any event, the weight of the evidence as well as the credit to be given to the witnesses are matters for the jury, and only the jury, to determine in a case where it is the trier of the facts. Rule 739 c; *Judy v. State*, 218 Md. 168, 146 A. 2d 29 (1958).

For the reasons assigned the judgment of the trial court must be affirmed.

*Judgment affirmed, the costs to be paid by the appellant.*

---

1. The meaning of these terms is set forth in Code (1957), Art. 27, § 16.