514 A.2d 4

**Gerald WHITAKER et al.**

**v.**

**PRINCE GEORGE'S COUNTY, Maryland.**

**No. 6, Sept. Term, 1986.**

Court of Appeals of Maryland.

Aug. 28, 1986.

Sean Daniel Wallace and William C. Brennan, Jr. (Knight, Manzi, Brennan & Ostrom, P.A., on brief), Upper Marlboro, for appellant.

Joyce B. Hope, Associate Co. Atty. (Thomas P. Smith, Co. Atty., Michael O. Connaughton, Deputy Co. Atty. and Tonia Y. Belton, Associate Co. Atty., on Brief), Upper Marlboro, for appellee.

Argued before MURPHY, C.J., and SMITH,* EL-DRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

COUCH, Judge.

The present appeal comes to us as a consolidation of three appeals from the Circuit Court for Prince George's

---

* Smith, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Art. IV, § 3A, he also participated in the decision and the adoption of this opinion.

County, Maryland (Bowen, J.). All three appeals were consolidated in the Court of Special Appeals by Order dated December 27, 1985.[1] The subject matter of these appeals arose as a result of an investigation conducted by the Prince George's Police Department into the alleged activities of several business establishments suspected of being houses of prostitution or "bawdyhouses." [2] We follow with a brief overview of the factual and procedural background leading to the instant appeal.

## I

### *Appeals No. 1229 and No. 1231*

On July 8, 1985, after the investigation had been conducted, Prince George's County ("County" or "Appellee") filed in the Circuit Court for Prince George's County a Bill of Complaint for Injunctive Relief and Ex Parte and Permanent Injunction against Cary Greene and Paul Malone as owners of property located at 11100 Baltimore Boulevard, Beltsville, Maryland, Gerald Whitaker and Faith McCollum as occupants of the premises trading as "J.J.'s Photo Studio" (hereinafter "J.J.'s" or "Photo Studio") located at

---

**1.** Appeal No. 1229 is from an "Order of Permanent Injunction" dated August 7, 1985. Appeal No. 1231 is from an Order dated October 3, 1985, finding appellants to be in contempt of the August 7, 1985 Order of Permanent Injunction. Finally, Appeal No. 1230 is from an Order dated October 9, 1985, finding appellant Faith McCollum to be in contempt of two "Orders of Permanent Injunction" issued on April 13, 1981.

**2.** The keeping of a bawdyhouse is a common law misdemeanor in Maryland, though its punishment is fixed by statute. *Ward v. State,* 9 Md.App. 583, 267 A.2d 255 (1970). A bawdyhouse is a species of disorderly house. *Reynolds v. State,* 219 Md. 319, 325, 149 A.2d 774 (1959); *Beard v. State,* 71 Md. 275, 17 A. 1044 (1889) (disorderly house defined). *Cf. Shaffer v. State,* 87 Md. 124, 39 A. 313 (1898). The legal commentators are in accord. *See* 2 Wharton Criminal Law § 1722 (12th ed. 1932); Hochheimer's Criminal Law §§ 309–12 (2d ed. 1904); 24 Am.Jur.2d *Disorderly Houses* §§ 1, 5. We note, however, that a bawdyhouse is not the same as a house of prostitution. *Lutz v. State,* 167 Md. 12, 16, 172 A. 354 (1934). This distinction has no import on our analysis herein.

the above address, Johnnie Robert Parries as manager of "J.J.'s", and alleged prostitutes Alison Irene Glenn, Rita Lee Jarboe, Donna Jean Barden, Denise Marie Watts, Laurie Gale Foster, Carmen Milagres Feliciano, Janet Marie Prather, and Margaret Helen Alvey (hereinafter "Appellants").

The Complaint alleged, *inter alia,* that J.J.'s operates seven days a week and serves an exclusively male clientele; that, upon entering the Photo Studio, a prospective customer is greeted by several females and asked to select the female of his choice. After choosing a female attendant, the customer is asked to choose a type of session. For a flat half-hour rate of thirty dollars ($30.) or an hourly rate of fifty dollars ($50.), the customer gets a room with a bed for the prescribed period of time. Female employees of the Photo Studio allegedly receive additional income by bargaining with customers for sex acts to be performed by them during the pre-paid "sessions." Customers pay additional amounts for the aforementioned acts.

Investigations conducted by County police, consisting of surveillance, searches and oral interviews of customers allegedly revealed that only male customers entered the premises, none of whom carried or wore any type of athletic apparel, suntanning apparel or art or photographic equipment. No photographic equipment was found at the establishment as a result of a search of the premises. It was thus alleged that appellants, among others, were involved in various capacities in the operation of a business that was "a blatant house of ill repute, a bawdyhouse ... and a nuisance per se." The County sought to enjoin appellants, temporarily and permanently, from

"conducting, owning, financing, leasing, operating, managing, supervising, or in any manner whatsoever, associating with the house of prostitution which exists as a nuisance per se...."

Judge Albert T. Blackwell of the Circuit Court for Prince George's County signed an Ex Parte Order, Ex Parte In-

junction and Order to Show Cause on July 8, 1985 abating the "operation of a house of lewdness, assignation, and prostitution at the subject property by the [appellants]" until a decision could be rendered on the Bill of Complaint for Injunctive Relief and Permanent Injunction.

Hearing on the Show Cause order was held on July 29, 1985 before Judge Perry Bowen. The County presented a variety of witnesses and evidence regarding prostitution, including several County police officers who testified that the subject establishment had been under investigation since 1978 as a bawdyhouse. Judge Bowen issued an oral opinion from the bench indicating that the Ex Parte Injunction would be made permanent, thus enjoining appellants from engaging in prostitution or prostitution related activities in Prince George's County. This Order was signed and filed on August 7, 1985; it was subsequently posted on the subject establishment. The appellants filed a timely appeal to this Order (Appeal No. 1229).

On August 19, 1985, the County filed a Motion to Cite Defendants for Contempt. The County alleged in its Motion that appellants continued to operate the Photo Studio as a house of lewdness, assignation, and prostitution despite the August 7, 1985 order of court. The action proceeded to hearing on September 26, 1985, where Judge Bowen refused to dismiss the proceedings and denied appellants' demand for a jury trial. At the conclusion of the hearing, Judge Bowen found appellants to be in willful contempt of court by the continued operation of a bawdyhouse contrary to the August 7, 1985 Order. Appellants Faith McCollum and Gerald Whitaker were ordered to post bonds guaranteeing that they would not be involved with prostitution or prostitution related activities in Prince George's County. Appellants Greene and Malone were ordered to post bonds guaranteeing that the subject real property would not be used for a house of lewdness, assignation, and prostitution. Appellants Prather, Watts and Alvey were ordered to post bonds of personal recognizance guaranteeing that they would not engage in prostitution. Appellant Parries was

required to post a $10,000 surety bond. An Order to this effect is dated October 3, 1985. A Notice of Appeal was filed on October 22, 1985 from that Order (Appeal No. 1231).

### Appeal No. 1230

On July 26, 1985, the County filed a Motion to Cite Defendant [McCollum] for Contempt for continuing to operate a bawdyhouse in violation of two "Orders of Permanent Injunction" dated April 13, 1981. The two Orders enjoined appellant Faith McCollum from being involved in prostitution or prostitution related activities at 11100 Baltimore Boulevard, Beltsville, Maryland, or at any other location in the County. On August 12, 1985 an Order granting Show Cause was filed by the trial court (Woods, J.); appellant McCollum's Motion to Strike and Demand for Jury Trial, filed on August 26, was denied by the court (McCullough, J.) after a hearing held on August 30, 1985. At the end of that hearing the proceedings were continued until October 2, 1985, over appellant's objection, for Judge Bowen to hear.

Judge Bowen concluded at the end of the October 2 hearing that appellant McCollum was in willful and flagrant contempt of court for violating the Orders issued on April 13, 1981. McCollum was given a six month suspended sentence and ordered to pay a six thousand dollar ($6,000.00) fine to purge herself of contempt. An Order to this effect was signed on October 9, 1985. On October 21, a timely Order of Appeal was entered. We granted the writ of certiorari on our own motion on March 12, 1986 to resolve the questions presented by the consolidated actions.

### II

### Assignment of Trial Judge

■ First, we are asked to consider the propriety of the assignment of the underlying actions to Judge Bowen of the Circuit Court for Calvert County by Judge Ernest Loveless, Circuit Administrative Judge of the Seventh Judicial Circuit.

Appellants take issue with this assignment by challenging the constitutional validity of Md. Rule 1202(b)(1). They claim that, in light of Art. IV, § 18(b) of the Maryland Constitution, the Rule impermissibly expands both the number of judges allowed to make assignments and the circumstances in which such assignments are to be made.[3] Appellants conclude, therefore, that the instant assignment of Judge Bowen to the actions was improper. We disagree.

Md. Rule 1202(b)(1) was promulgated by this Court in implementation of the constitutional power vested in it under § 18(a) to make rules governing the administration of

---

**3.** Md. Rule 1202(b)(1) provides:
"*b. Circuit Administrative Judge.*
1. Assignment Within First Seven Judicial Circuits.
   Except for assignments made pursuant to section a of this Rule, the Circuit Administrative Judge of each of the first seven judicial circuits may assign any judge of his judicial circuit to sit as a judge of the Circuit Court of any county in the judicial circuit, in any specific case or cases or for any specified time. Such assignments may be made orally or in writing."
Art. IV, § 18(a) of the Maryland Constitution states:
Section 18. *Powers and duties of Chief Judge of Court of Appeals; assignment of judges; rule-making power of Court of Appeals.*
"(a) The Court of Appeals from time to time shall adopt rules and regulations concerning the practice and procedure in and the administration of the appellate courts and in the other courts of this State, which shall have the force of law until rescinded, changed or modified by the Court of Appeals or otherwise by law...."
§ 18(b) provides:
"(b) The Chief Judge of the Court of Appeals shall be the administrative head of the Judicial system of the State. He shall from time to time require, from each of the judges of the Circuit Courts, of the District Court and of any intermediate courts of appeal, reports as to the judicial work and business of each of the judges and their respective courts. He may, in a case of a vacancy, or of the illness, disqualification or other absence of a judge or for the purpose of relieving an accumulation of business in any court assign any judge except a judge of the Orphans' Court to sit temporarily in any court except an Orphans' Court. Any judge assigned by the Chief Judge of the Court of Appeals pursuant to this section has all the power and authority pertaining to a judge of the court to which he is so assigned; and his power and authority shall continue with respect to all cases (including any motion, or other matters incidental thereto) which may come before him by virtue of such assignment until his action thereon shall be completed...."

the trial courts of the State and expressly grants unto a circuit administrative judge the power of assignment within his *judicial circuit.* "[T]he Circuit Administrative Judge of each of the first seven judicial circuits may assign any judge of his *judicial circuit* to sit as a judge of the Circuit Court of any county in the judicial circuit, in any specified case or cases or for any specified time." (emphasis supplied). Md. Rule 1202(b)(1). As the unambiguous language suggests, the effect of Rule 1202(b)(1) is to provide each circuit administrative judge of each (of the first seven) judicial circuits, under the overall aegis of the Chief Judge of the Court of Appeals, broad powers of assignment. Whether it be by the Court of Appeals directly or the circuit administrative judge as its *alter ego* in the circuit, this power and authority encompasses all facets of the internal management of our courts.

It must be pointed out that a judge of a circuit court is indeed a judge of a judicial circuit of Maryland. *See* Md. Const. art. IV, §§ 19–22. Since Judge Bowen was a judge of the Seventh Judicial Circuit of Maryland, of which Calvert County is a part, Md. Const. art. IV, § 19, Judge Loveless as circuit administrative judge of that circuit was not without authority in assigning the proceedings to Judge Bowen.

Appellants' assertions that Rule 1202(b)(1) expands the number of judges allowed to make assignments and the circumstances in which assignments can be made fails to recognize the existence of this deliberate but flexible scheme of internal management set forth by the Rule. This scheme can be implemented by the Chief Judge of the Court of Appeals, 1202(a)(1), *or* a circuit administrative judge, 1202(b)(1). In either case, the broad purpose of the rule, *i.e.,* effective internal management and administration of the courts, is met.

Further, the scheme set forth in Rule 1202 is not inconsistent with the constitutional grant of authority to the Chief Judge of the Court of Appeals by Art. IV, § 18(b) of

our Constitution, since Rule 1202 provides the framework necessary to implement Art. IV, § 18's chief purpose of providing flexibility to the Maryland judicial system.[4] *Baltimore Radio Show, Inc. v. State*, 193 Md. 300, 317, 67 A.2d 497 (1949), *cert. denied*, 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562 (1950) (referring to § 18A, predecessor to present § 18); *Brack v. State*, 187 Md. 542, 51 A.2d 171 (1947).

In sum, we find no merit to appellants' contention.

### Enjoining the Nuisance

Since the keeping of a bawdyhouse or "disorderly house" generally constitutes a criminal offense,[5] *Jackson v. State*, 176 Md. 399, 5 A.2d 282 (1939); *Lutz v. State*, 167 Md. 12, 172 A. 354 (1934); *Rosenberg v. State*, 54 Md.App. 673, 681, 460 A.2d 617 (1983); Md. Code (1957, 1982 Repl.Vol.), Art. 27, §§ 15–17, the question arises as to whether an equitable action to abate or enjoin the existence and maintenance of such an establishment may properly be maintained. Appellants contend that their activities cannot be enjoined merely because they may violate bawdyhouse and prostitution laws; [6] that equitable action cannot lie since adequate remedies at law are available.

We see it differently.

█ It is a general rule of law that, where the acts complained of constitute a breach of the criminal law, courts of equity will not for that reason alone take jurisdiction to enjoin the further continuance or prevention of threatened illegal acts. *In re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895); *Ruark v. Engineer's Union*, 157 Md. 576, 146 A. 797 (1929); *Dvorine v. Castelberg Corp.*, 170 Md. 661, 185 A. 562 (1936). Where, however, the

---

**4.** *See supra* note 4 and accompanying text.

**5.** *See supra* note 2 and accompanying text.

**6.** Appellants admit in brief that, under *Hamilton v. Whitridge*, 11 Md. 128, 132, 69 Am.Dec. 184 (1857), "the keeping of a bawdyhouse is confessedly a public nuisance ... indictable as a criminal offense."

enforcement of the criminal law is merely incidental to the general relief sought and the acts complained against constitute a nuisance or a danger to the public health and public welfare and a more complete remedy is afforded by injunction than by criminal prosecution, a court of equity may, on the request of a duly constituted authority, grant the relief sought by the injunction. *See,* for example, *State v. Ficker,* 266 Md. 500, 510, 295 A.2d 231 (1972); *Clark v. Todd,* 192 Md. 487, 492, 64 A.2d 547 (1949); *Hamilton v. Whitridge,* 11 Md. 128, 69 Am.Dec. 184 (1857); *Stead v. Fortner,* 255 Ill. 468, 99 N.E. 680, 684 (1912); *High on Injunctions* (4th ed. 1905), § 752, p. 716. *See additionally* 5 Pomeroy, *Equity Jurisprudence,* § 1893, p. 4296 (2d ed. 1919); 66 C.J.S. *Nuisances* § 110 e; 58 Am.Jur.2d *Nuisances* §§ 142–43 and discussion therein.[7]

We think that the keeping, operation and maintenance of a bawdyhouse constitutes such a public nuisance whereby equity jurisdiction would lie to grant appropriate relief. In *Hamilton,* 11 Md. 128, 69 Am.Dec. 184 (1857), the plaintiffs sought to enjoin Margaret Hamilton from occupying and using a recently purchased house as a bordello. She had been thrice convicted of keeping a bawdyhouse in the years 1854 and 1855. In affirming the continuance of the injunction granted at trial, this Court stated:

> "We are constrained ... to consider the appellant as a person about to open the premises as a house of ill-fame, and the prominent question for decision is, whether the jurisdiction of courts of equity embraces the prohibition of such public nuisances, where the complaint is, that they will, by reason of their close proximity, deprive other persons of the comfortable enjoyment of their property, and greatly depreciate and lessen its value.

*     *     *     *     *     *

---

7. As to equity jurisdiction to abate a nuisance which is also a crime, see generally 27 Am.Jur.2d *Equity* § 57; 42 Am.Jur.2d *Injunctions* §§ 157 et seq; 58 Am.Jur.2d *Nuisances* §§ 142 et seq.

"Although at law, the remedy in respect to public nuisances is by indictment, and in respect to private ones, by action at the instance of the person injured, yet, in the common law tribunals, redress may be had for damage resulting from public as well as private nuisances. These remedies can only abate or afford compensation for an existing nuisance, and are ineffectual to restrain or prevent such as are threatened or in progress. Hence there is a jurisdiction in equity to enjoin, whenever the nature of the inquiry is such that it cannot be adequately compensated by damages, or from its continuance or permanent mischief, will occasion a constantly recurring grievance. And as a party injured by a public nuisance may have his action at law for damages thereby sustained, so he may apply for an injunction to prevent such nuisances, if its existence will cause a substantial prejudice to his property, or the reasonable enjoyment thereof."

*Id.* at 144–46, 69 Am.Dec. 184 (citations omitted). *See City of Bowie v. County Comm'rs*, 260 Md. 116, 128, 271 A.2d 657 (1970).

■ In keeping with what our predecessors said in *Hamilton*, we believe that the operation of a bawdyhouse constitutes a public nuisance whereby equity jurisdiction would lie to afford a more complete remedy than is obtainable by law. Accordingly, the trial court had jurisdiction to consider the Bill of Complaint for Injunctive Relief.

### Challenge of the Searches

■ Appellants allege that they were denied the opportunity to litigate the validity of the searches of the subject establishment conducted by the Prince George's County Police in connection with the police investigation.[8] They base their argument on the purported applicability of the exclusionary rule to the proceedings at bar. For support,

---

**8.** At trial Detective Clifford Mack testified, over objection, as to the events of the execution of the search and seizure warrants on the subject premises.

appellants rely in part on *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), where the Supreme Court made the exclusionary rule applicable to state criminal trials:

> "Since the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against them by the same sanction of exclusion as is used against the Federal Government." *Id.* at 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

Conceding that *Mapp* speaks only to application of the exclusionary rule to state criminal proceedings, appellants nonetheless argue that the rule's applicability should be extended to the present proceedings. For this proposition, appellants rely on the 1965 case of *One Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170. There, the Supreme Court applied the exclusionary rule in a proceeding for forfeiture of an automobile used in violation of the criminal law. In so doing, the Court expressly relied on the fact that "forfeiture is clearly a penalty for the criminal offense" and "[i]t would be anomalous indeed, under these circumstances, to hold that in the criminal proceeding the illegally seized evidence is excludable, while in the forfeiture proceeding, requiring the determination that the criminal law has been violated, the same evidence should be admissible." *Id.* at 701, 85 S.Ct. at 1251. See also *Boyd v. United States*, 116 U.S. 616, 634, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886), where a forfeiture proceeding was characterized as quasi-criminal.

Thus, in effect, appellants ask us to create judicially an extension of the fourth amendment exclusionary rule by holding that evidence obtained by a law enforcement officer (here, a County detective) in good faith reliance on a purportedly defective search and seizure warrant should be inadmissible in a public nuisance action. We decline to do so.

The exclusionary rule was created and has been applied primarily for the purpose of deterring police invasions of a defendant's constitutional rights by barring evidence illegally obtained from admission at the criminal trial of that defendant. *See Weeks v. U.S.*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).

In *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), it was established that the exclusionary rule's prime purpose, if not its sole one, "is to deter future unlawful police conduct." *Calandra*, 414 U.S. at 347, 94 S.Ct. at 619. *See United States v. Peltier*, 422 U.S. 531, 536–39, 95 S.Ct. 2313, 2317–18, 45 L.Ed.2d 374 (1975). Thus,

"[t]he rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Calandra*, 414 U.S. at 348, 94 S.Ct. at 620.

And,

"Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons. As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Ibid.*

The Court in *Calandra* noted that there is a balancing process implicit in a determination of the appropriateness of the exclusionary rule to a given situation; the potential benefits of applying the rule (*i.e.*, deterrence) must be balanced against the potential damage from such application. An important consideration to this process is the extent to which exclusion would deter, or non-exclusion would encourage, illegal searches and seizures. *See* 1 La Fave, *Search and Seizure* § 1.5 (1978).

While the Supreme Court has never directly applied the exclusionary rule in a civil case, it ruled in *Janis, supra,* that evidence illegally seized by state agents in good faith and in reliance on a warrant may be used in a federal civil tax proceedings. Though the ruling cannot be said to stand for the proposition that evidence may *never* be excluded in a civil proceeding, it nonetheless severely undermined those cases in lower courts which applied the exclusionary rule to civil proceedings. *Morale v. Grigel,* 422 F.Supp. 988 (DNH 1976).[9] In *Janis,* the Court, in balancing the need for deterrence in inter-sovereign violations of the fourth amendment (those cases where the criminal law enforcement officer had no responsibility or duty to, or agreement with, the sovereign seeking to use the illegally obtained evidence)[10] against the societal cost of exclusion, noted "In the complex and turbulent history of the rule, the Court never has applied it to exclude evidence from a civil proceeding, federal or state." *Janis,* 428 U.S. at 447, 96 S.Ct. at 3029.[11]

---

**9.** Lower federal and state courts have had occasion to exclude illegally obtained evidence in a variety of proceedings. *See, e.g., United States v. Blank,* 261 F.Supp. 180 (ND Ohio 1966) (taxpayer assessment proceeding); *Lassoff v. Gray,* 207 F.Supp. 843 (W.D.Ky.1962) (taxpayer assessment proceeding); *Carlisle v. State,* 276 Ala. 436, 163 So.2d 596 (1964) (proceeding to abate gambling nuisance); *Carson v. State,* 221 Ga. 299, 144 S.E.2d 384 (1965) (proceeding to abate gambling nuisance); *Williams v. Williams,* 8 Ohio Misc. 156, 221 N.E.2d 622 (1966) (divorce action); *Amiss v. State,* 135 Ga.App. 784, 219 S.E.2d 28 (1975) (revocation of probation proceeding).

**10.** The Court expressly declined to rule on the applicability of the exclusionary rule in an intra-state setting (those cases in which the officer perpetrating the illegal search and seizure was an agent of the sovereign that sought use of the evidence).

**11.** Some courts prior to and following the *Janis* decision have held that the rule applies to civil proceedings when the violation was made by officers of the sovereign involved in the proceeding. *See, e.g., Powell v. Zuckert,* 366 F.2d 634 (D.C.1966) (evidence illegally seized by government agents inadmissible in subsequent Air Force discharge proceedings); *Pizzarello v. United States,* 408 F.2d 579 (2d Cir.), *cert. denied,* 396 U.S. 986, 90 S.Ct. 481, 24 L.Ed.2d 450 (1969) (federal tax assessment based on evidence illegally procured by IRS held invalid); *United States v. Blank,* 261 F.Supp. 180 (N.D.Ohio 1966); *Iowa v.*

Turning to the instant case, though the consequences of the County's suit may be grave, it is not a criminal proceeding and in no sense is the action vindictive or punitive. Rather, the proceedings only seek determination of whether appellants engaged in prostitution-related activities and, if so, whether those activities should be enjoined, and whether those activities were violative of certain court orders. In such a case the use in evidence of that which might be excluded in a criminal trial does not involve a constitutionally protected interest.

Moreover, the additional marginal deterrence that might result from a judicially created extension of the rule here would not, in our view, outweigh the cost to society in excluding what might concededly be relevant and reliable evidence.

Thus, we find that practically no deterrent effect could be anticipated by applying the rule to these proceedings. A detective who might be tempted to obtain evidence illegally for use in a criminal case may not even consider the effect of such illegality upon a proceeding to abate a public nuisance. Here, testimony at trial indicated Detective Mack's good faith reliance on the validity of the search and seizure warrants. Given this and in light of the civil nature of the proceedings before us, we conclude that the exclu-

---

*Union Asphalt and Roadoils, Inc.,* 281 F.Supp. 391 (S.D.Iowa 1968), *aff'd sub nom., Standard Oil Co. v. Iowa,* 408 F.2d 1171 (8th Cir.1969); *Vander Linden v. United States,* 502 F.Supp. 693 (S.D.Iowa 1980); *Midwest Growers Cooperative Corp. v. Kirkemo,* 533 F.2d 455 (9th Cir.1976); *Knoll Assoc., Inc. v. FTC,* 397 F.2d 530 (7th Cir.1968); *Donovan v. Sarasota Concrete Co.,* 693 F.2d 1061 (11th Cir.1982).

Some courts have declined to apply the exclusionary rule to certain civil proceedings. *See, e.g., Emslie v. State Bar,* 113 Cal.Rptr. 175, 520 P.2d 991 (1974); *Morale v. Grigel,* 422 F.Supp. 988 (DNH 1976); *Ekelund v. Sect'y of Commerce,* 418 F.Supp. 102 (E.D.N.Y.1976); *Governing Board v. Metcalf,* 111 Cal.Rptr. 724 (1974); *Matter of Robert P.,* 61 Cal.App.3d 310, 132 Cal.Rptr. 5 (1976); *Roman v. McGuire,* 123 Misc.2d 1027, 475 N.Y.S.2d 222 (1984). *See generally* Ringel, *Search & Seizures, Arrests and Confessions* (2d ed. 1985); Hall, *Search and Seizure* (1982, 1986 Cum.Supp.). *See additionally INS v. Lopez-Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984).

sionary rule is a remedy unavailable to appellants. The language of *Calandra,* coupled with the Court's refusal to extend the exclusionary rule to a civil proceeding in *Janis,* albeit upon a rationale which is not applicable in the instant case, supports this conclusion and is suggestive of that Court's intention to limit the applicability of the exclusionary rule to criminal proceedings.

## Adverse Inferences from Invocation Of Privilege Against Self-Incrimination

■ At the July 29, 1985 hearing the County called appellant McCollum as its first witness. Upon being questioned by the County about certain facts surrounding the operation of the "Photo Studio," McCollum invoked her fifth amendment privilege against self-incrimination.[12]

A similar exchange took place with respect to McCollum and several other appellants at the hearing conducted on September 26, 1985. Upon the County's request, the trial judge agreed to draw an adverse inference from appellants' invocation of the fifth amendment privilege.

Counsel for appellants contend that the trial court erred in taking a negative inference from appellants' invocation of that privilege. We disagree.

Though by its terms applicable only in criminal proceedings,[13] the fifth amendment privilege against self-incrimina-

---

**12.** The fifth amendment to the U.S. Constitution provides in part: "No person ... shall be compelled in any criminal proceeding to be a witness against himself." The amendment was deemed incorporated into the fourteenth amendment, and thus made applicable to the states in 1964. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653.

**13.** Since the fifth amendment was made applicable to the states under the fourteenth amendment, *McCarthy,* 266 U.S. 34, 45 S.Ct. 16, the Supreme Court has addressed the application of the privilege in non-criminal matters in the following cases: *Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); *Gardner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); *Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation,* 392 U.S. 280,

tion has long been held to extend to compelling answers by parties or witnesses in civil litigation. "[The privilege] applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it." *McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924). *See Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973).

Thus, in a civil case the fifth amendment does not preclude from disclosure facts which would tend to establish civil liability, but rather protects a witness from being required to make disclosure, otherwise compellable in the trial court's contempt power, which could incriminate him in a later criminal prosecution. 8 *Wigmore on Evidence* § 2254 (McNaughton rev. 1961) and discussion therein. When a witness in a civil proceeding refuses to answer a question on the ground that his answer might tend to incriminate him, the result sought to be achieved by invoking the privilege is accomplished. Such refusal cannot be used against him in a subsequent criminal proceeding. However, the trier of facts in a civil case is entitled to draw an inference from his refusal to so testify. *See, e.g., Ikeda v. Curtis,* 43 Wash.2d 449, 261 P.2d 684 (1953). *Ikeda* was a fraud case. The plaintiffs brought the action contending that, in the sale of a hotel to them, the defendant fraudulently concealed from plaintiffs the fact that the hotel had been used by the defendant as a house of prostitution. The Supreme Court of Washington, in holding that an adverse inference could be taken when a witness in a civil suit refuses to answer a question on the ground that his answer might tend to incriminate him, quoted:

" ' ... The privilege is not for the benefit of the guilty nor to enable the claimant to prevail in civil suits by means of it. The privilege is to be protected from com-

---

88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); *Lefkowitz, supra,* 414 U.S. 70, 94 S.Ct. 316; *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). See generally *National Acceptance Co. of America v. Bathalter,* 705 F.2d 924 (7th Cir.1983) for an overview of these cases.

pulsory disclosure of criminal liability or facts connecting the claimant with crime. See In re Berman, 105 Cal.App. 37, 287 P. [125] 126. To hold that no inference could be drawn from the refusal of these witnesses to explain their dealings, in the face of so many suspicious circumstances, would be an unjustifiable extension of the privilege for a purpose it was never intended to fulfill.' " 261 P.2d at 690, quoting *Fross v. Wotton,* 3 Cal.2d 384, 44 P.2d 350, 354 (1935).

Put yet another way, the privilege does not forbid the drawing of adverse inferences against parties to civil actions when they refuse to testify. Our holding is in accord with the prevailing view, that the fifth amendment "does not preclude the inference where the privilege is claimed by a *party to a civil cause.* " Wigmore § 2272, p. 439 (footnote omitted) (emphasis the author's); *see also Baxter,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *Olin Corp. v. Castells,* 180 Conn. 49, 428 A.2d 319 (1980). *Cf. Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (constitutional error under fifth amendment to instruct jury in a *criminal* case that it may draw inference of guilt from a defendant's failure to testify).

After *Baxter,* "there is no longer any doubt that at trial a civil defendant's silence may be used against him, even if that silence is an exercise of his constitutional privilege against self-incrimination." *Bathalter,* 705 F.2d 924, 929.

We note that appellants' refusal to testify, taken alone, would not justify a finding that the "Photo Studio" was being maintained and operated as a bawdyhouse. *See Larsen v. Romeo,* 254 Md. 220, 255 A.2d 387 (1969) (negative inference is not substantive evidence and does not relieve party of burden of proof). However, an adverse inference may be drawn from the refusal by appellants to so testify, which may be coupled and considered with proper and relevant evidence tending to prove such fact.

Significantly, the record below provides no indication that appellants' invocation of the fifth amendment privilege re-

sulted in an adverse judgment. Nowhere in the record is it clear that the trial court gained critical facts from or otherwise based its ruling on inferences drawn from appellants' invocation of their privilege. Indeed, counsel for appellants at argument conceded that Judge Bowen "perhaps" could have reached his conclusion wholly apart from drawing inferences from appellants' invocation of the privilege.

Accordingly, we find no merit to appellant's contention.

### *Right to Jury Trial*

■ Appellants requested a jury trial prior to commencement of the contempt proceedings below. That request was denied by the trial judge who stated in part:

"No question this Court is proceeding totally in a civil matter.

*    *    *    *    *    *

"You [appellants] are certainly not entitled to a jury trial on a civil contempt proceeding and we deny your request for it."

Appellants take issue with this denial, contending the contempt proceeding was criminal rather than civil in nature and they were entitled to a jury trial.

In the past, we have had occasion to consider whether a person accused of committing a criminal contempt was entitled to a jury trial on that charge. For example, in *Wilkens v. State*, 293 Md. 335, 444 A.2d 445 (1982), this Court was presented with the issue of whether a person accused of committing a direct *criminal* contempt of court may be sentenced to a term in excess of six months imprisonment without having been afforded the opportunity for a jury trial. In holding that a defendant's right to a jury trial in cases of serious criminal contempt may not be abridged the Court noted, quoting from *Taylor v. Hayes*, 418 U.S. 488, 495, 94 S.Ct. 2697, 2701, 41 L.Ed.2d 897 (1974):

"[O]ur cases hold that petty contempt like other petty criminal offenses may be tried without a jury and that

contempt of court is a petty offense when the penalty actually imposed does not exceed six months or a longer penalty has not been expressly authorized by statute. [citations omitted]."

*Wilkens*, 293 Md. at 338–39, 444 A.2d 445. Further, "in the absence of legislative authorization of serious penalties for contempt, a state may choose to try any contempt without a jury if it determines not to impose a sentence longer than six months." *Taylor*, 418 U.S. at 496, 94 S.Ct. at 2702. *See additionally Muniz v. Hoffman*, 422 U.S. 454, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975) (and cases cited therein).

We recognized these principles in *Roll and Scholl v. State*, 267 Md. 714, 298 A.2d 867 (1973), where we noted, "The right to a jury trial is guaranteed if the offense is serious, *i.e.*, may be punished by an imprisonment of six months or more. *Bloom v. Illinois*, 391 U.S. 194, 20 L.Ed. 2d 522, 88 S.Ct. 1477 (1968)." 267 Md. 714 at 730, n. 11, 298 A.2d 867. *See also Sheets v. City of Hagerstown*, 204 Md. 113 at 118, 102 A.2d 734; *A.V. Laurins v. Prince George's Co.*, 46 Md.App. 548 at 562, 420 A.2d 982. *Cf. In Re Martin*, 10 Md.App. 385, 270 A.2d 674 (1970), *cert. denied*, 403 U.S. 955, 91 S.Ct. 2292, 29 L.Ed.2d 865 (1971). *Dorsey v. State*, 56 Md.App. 54, 466 A.2d 546 (1983). Under the circumstances present here, where the ultimate sentence was not in excess of six months, even if the proceeding was a criminal proceeding there would have been no right to a jury trial under the above authority; thus we find no error on this issue.

## Evidentiary Sufficiency and Rulings

■ Finally, appellants contend that the evidence presented by the County at trial below was insufficient to support the issuance of an injunction.

In our opinion, the County did meet its burden of proof and the findings of the trial court were supported by the evidence and most certainly were not "clearly erroneous." *See* Md. Rule 886.

The evidence indicates, as the trial court found, that the activity taking place at the subject premises for a considerable period of time was activity which would be described as prostitution. Two witnesses for the County testified that they entered J.J.'s Photo Studio for the (sole) purpose of seeking some sort of sexual gratification. Upon entering the establishment, they were greeted by its employees and were asked to choose a girl. After making a selection and paying an amount of money for a "session room," another payment of money was made to the girl for the "type of session" requested. Ultimately, a variety of sexual relations were engaged in, according to the testimony.

It was stipulated by the parties that another witness would have testified that he went to the subject establishment and paid money for sexual gratification.

Detective Clifford Mack of the Prince George's County Police Department testified that, in the course of the ongoing investigation of the "Photo Studio", he entered the premises and discovered a partially clothed male and female in a session room. Additionally, he observed another female employee in a different room only partially clothed. No photographic equipment was found on the premises. However, numerous types of sexual devices were found in various rooms throughout the premises.

Testimony from Dr. Nigel Jackman, Director of Community Health Services for Prince George's General Hospital, indicated that prostitutes have a higher incidence of sexually transmitted diseases than non-prostitutes; that a health hazard would exist if one considers what would occur should one contract and communicate such diseases.

Finally, appellant McCollum, when called as a witness by the County, invoked her privilege against self-incrimination. (See our discussion, *supra*). As previously noted, though there is no indication that the trial court based its conclusions on the drawing of an adverse inference from McCollum's invocation of her privilege, the drawing of such an inference would have been permissible as long as it was not

the *sole* basis for the trial court's conclusions. It is clear that such was not the case.

In sum, the evidence before the trial court was sufficient to support issuance of the injunction. Md. Rule 886.

Appellants argue that the trial court erroneously admitted into evidence testimony regarding the arrests of certain appellants, photographs of the subject premises, and professional articles investigating and discussing sexually transmitted diseases. Further, counsel contends that he was refused the opportunity to fully cross-examine one of the County's witnesses as to that witness's relationship with the County during its investigation.

As to appellants' contention that the trial judge erred in several respects in regard to certain proffered evidence and the admission of other evidence, we have examined the record and find no reversible error. The admissibility of evidence is largely a matter for the use of discretion by a trial judge. *See, e.g., Sanner v. Guard,* 236 Md. 271, 203 A.2d 885 (1964); *Schear v. Motel M'gt. Corp. of America,* 61 Md.App. 670, 487 A.2d 1240 (1985). We find no such abuse here.

JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANTS.