583 A.2d 1037

**Leslie Allen BINNIE**

v.

**STATE of Maryland.**

**No. 49, Sept. Term, 1990.**

Court of Appeals of Maryland.

Jan. 10, 1991.

José Felipé Anderson, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief), Baltimore, for petitioner.

Valerie J. Smith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ.,

ROBERT L. KARWACKI,* Judge of the Court of Special Appeals, Specially Assigned, and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

Judgment was entered in the Circuit Court for Washington County against Leslie Allen Binnie upon his conviction by a jury of the misdemeanor of theft of property having a value of less than $300. Maryland Code (1957, 1987 Repl. Vol.), Art. 27, § 342(a) and (f)(2). In fact, the value of the property was eleven dollars. The Court of Special Appeals affirmed the judgment in an unreported opinion. We granted Binnie's petition for a writ of certiorari and denied the State's conditional cross-petition.

Binnie does not now challenge the proof of either the corpus delicti of the offense or his criminal agency. He seeks, however, a reversal of the judgment by reason of the trial judge's refusal to instruct the jury as he requested.

The way the State said the incident happened was adduced through the testimony of James Tosadori, a security officer employed by J.C. Penney Co., Inc., at its store in Hagerstown, Maryland. "Security windows" (two-way mirrors) were located in strategic areas high up along the walls inside the store, enabling a clandestine observation of the sales floor. According to Tosadori, he was behind one of the windows, looking down on the "men's area" when he saw Binnie at a rack on which hats were displayed. Binnie took a black hat from the rack and hid it inside his jacket "under his left arm pit, put his hand in his pocket, stood there for a while," then walked through the store, "stopping along the way to browse at stuff but nothing really like he was going to buy, just stopping to look."

---

* At the time this case was heard and conferenced, Karwacki, J., a judge of the Court of Special Appeals of Maryland, was specially assigned to this Court. At the time of the decision and adoption of this opinion, he had been commissioned and had qualified as a judge of this Court.

Tosadori observed Binnie's movements by means of the mirrors and ultimately by direct contact on the sales floor. Tosadori tailed Binnie through the store to the outside. Binnie did not speak to anyone before he took the hat or to anyone after he placed the hat under his jacket. He did not converse at any time with a person in the store, employee, or customer—"[h]e walked straight out." Although there was a cash register near the hat rack, and cash registers along the route Binnie followed in leaving the store, Binnie made no effort to contact the employees who manned them.

After Binnie left the store, Tosadori stopped him. Tosadori recounted what then ensued.

I explained to him that I was Officer Tosadori. I was with J.C. Penney's security. I introduced Officer Mayer as the security manager. I said, "We have a problem. We're missing a hat." I asked ... he looked at my i.d. I handed him my i.d. and he looked at it and handed it back to me. I asked him if he would help me find it and he agreed. I said, "Okay let's start looking here." And I reached inside his jacket and from under his underarm I pulled out the black hat.

* * * * * *

We said, "Didn't you leave the store without paying for this?" And he said, "Yes." I said, "Well let's go upstairs to our operations manager's office and we have to fill out forms we're going to bar you from the store." He said okay.

We went upstairs and filled out the forms that we fill out on shoplifters. He admitting to the theft and he said was dumb by doing it but he had done it anyway.

The form was an acknowledgement that a person "has stolen something from our store," that "they know what they stole and they know it was wrong." Binnie "refused to sign it thinking that he would be giving up his rights."

Tosadori identified the hat from a photograph and the photograph was admitted in evidence without objection. A price tag containing J.C. Penney's name was prominently

attached to the hat. Tosadori pointed out that the tag was "about three inches long and you have your plastic thing" attaching it to the hat. The plastic "gismo" was "about two inches so it's going to hang down so the customer can find the price tag." Tosadori avowed that the hat was never on the floor beneath the rack and that he did not see Binnie "lean down and pick up anything off the floor" near the hat rack. The officer iterated that when apprehended, Binnie admitted he stole the hat and did not indicate in any way that he believed it to be lost or abandoned property. The only explanation Binnie gave for stealing the hat was that "it was dumb, he just wanted the hat and didn't feel like paying for it."

Binnie's version as to how he came into possession of the hat may in no wise be reconciled with that of Tosadori. Binnie testified that he was in the store to buy some jackets and shirts. He met a friend and chatted with him. Something unusual occurred; he found a hat. His good fortune came about in this manner:

> While I was talking to my friend we were looking through a round rack similar to the one that was already testified, the round rack with the glass plate on top. I believe there was a sale sign sitting on top of it. That particular rack had clothes on it that were for sale and I believe one half had shirts on it and the other half had some jackets on it also for sale.

He found the hat underneath the rack while he was "leafing through."

> I spread the shirts far enough apart that I was leafing through them like one would on a straight rack and I looked down and right at the base of the leg where it comes down in where the wheels were there was a hat laying on the ground.

The hat was dirty.

> It looked like it might have been stepped on once or twice.... [I]t was crushed a little bit, the top of it. Usually when they're new they're you know nice and

formed and nice and flat.   And the top of it was crushed in.

Binnie said:

> I made a comment to my friend that was standing there about I found a hat.   I straightened the dent out and brushed the dirt off and I folded it around a little bit and I tried it on.   And I said, "Well even it fits."   And I looked for a price tag and there was no price tag visible at that time.

He admitted that he was familiar with Penney's price tags, and he looked for a tag on the hat but did not see any.

> I looked over the hat and there was no price tag on it.   So I was sort of interested you know in why exactly the hat was underneath there.   And at the time I was standing about fifteen feet from the sales clerk [manning a cash register] so I turned around and asked her.

He made no effort to conceal the hat.   He walked over to the sales clerk and "asked her if this was a J.C. Penney hat."

> She said she did not know.   I then asked her if . . . if they sold such hats.   She said she did not know but the hat rack was on the other side of the men's department in the corner I was free to go look.

So Binnie went over to the rack to look "for similar hats or anything identifiable that would slightly relate to the hat [he] had found on the floor to the hats on the rack."   Binnie claimed that there were "no hats on the rack that even come close to . . . like the one [he] had in his hand.   They all had price tags on their hats."   So Binnie went back over to the salesperson, "a tall lady," he had just talked to.

> At that time I says, "There was no hats . . . there was no price tag on the hat."   I explained to her exactly that I had found it on the floor, there was no price tags on it.   I went over and looked at the rack.   There was no hats like it on the rack and at that point she said, "Well I guess it's yours" very jokingly and she laughed.

At that point, Binnie said nothing further; "[he] walked out of the store." Binnie's friend had already left Binnie's presence. Binnie was carrying the hat "somewhat folded and just bent up a little bit ... just ... had a good grip on it." "[M]ost definitely," it was visible in his hand. When he was about 15 feet from the exit door of the store, he folded the cap up and stuck it in his pocket. When he reached the sidewalk outside the store, he was stopped by two men who proved to be Tosadori and Mayer, the security manager. They "grabbed" him and "spun [him] around."

> And there wasn't very much communication other than they did identify themselves and there was hardly any conversation. I believe it was Mr. Tosadori was on my left. They spun me around. He had one ... one hand here and the other hand he reached in at my coat and said, "What's this?" And at which time I think the older gentleman said, "You can come on with us."

Binnie did not resist or try to run; he "was completely cooperative as much as possible." He was taken to the office.

> Once we were inside the office they accused me of stealing the hat. I tried to explain exactly what happened. And the older gentleman was some ... some very much badgering in my opinion that he kept on cutting me off.

Binnie did not admit stealing the hat and refused to sign the form acknowledging that he stole it. He claimed that he did not see the price tag on the cap until he was in the office. He explained to the jury:

> "The tag apparently was inside of the lip [the sweatband of the cap]." I don't know if anybody has ever worn a baseball cap or had a chance to take a look at one of their son's or whatever. But they have a sweatband like on the inside. Now this particular tag was apparently on the inside of the hat and the tag was on the inside of the lip and therefore it was not visible when you would pick the hat up and look at it. The tag was not visible whatsoever.

He claimed that the lip or sweatband was wider than the price tag. Binnie avowed that if he had seen the price tag, he would have turned the cap over to the sales clerk. A hat, not exactly like the cap found on Binnie, but "comparable" was admitted in evidence on proffer by the defense for the edification of the jury. Binnie described the clerk to whom he said he talked only as a "tall lady," and, although she wore a name tag, he did not recall her name. He had not seen her or talked to her since that day. His explanation for not attempting to ascertain her identity was that he had been "banned" from the store premises.

The State is satisfied that "[t]he real issue in this case is whether Binnie was entitled to an instruction under [Code, Art. 27,] § 343(c)(2), providing that it shall be a defense to theft if '[t]he defendant acted in the honest belief that he had the right to obtain or exert control over the property as he did.'" In *Sibert v. State*, 301 Md. 141, 145–148, 482 A.2d 483 (1984), we traced the history of this affirmative defense fashioned by the Legislature. We observed that the Legislature apparently viewed it as a "claim of right" defense. *Id.* at 147, 482 A.2d 483. We referred to the Revision of Maryland Theft Laws and Bad Check Laws, 53, ch. 849 of Acts of 1978, Md.Spec.Rpts. (Joint Subcommittee on Theft Related Offenses, Oct. 1978). In *Sibert*, at 147, 482 A.2d 483, we quoted the observation of the Joint Subcommittee in its elaboration at 53–54 of the claim of right defense:

> The claim of right defense springs from the notion that in cases of common law larceny the defendant must have had an intent to permanently deprive the owner of the property.... [I]f the defendant can produce evidence that he was acting under an honest belief he had a "claim of right", *this will be weighed by the trier of the facts in resolving the issue of whether the defendant possessed the requisite mens rea to commit the offense of theft* [emphasis in *Sibert*].

We pointed out in *Sibert* that "[n]either the theft statute nor the accompanying legislative history defines the phrase

'honest belief.' " 301 Md. at 149, 482 A.2d 483. Nevertheless, we found it "clear that this defense operates to negate the *mens rea* for the offense of theft, thereby providing a total defense." *Id.* We looked to the commentary to the Model Penal Code (Official Draft and Revised Comments, 1980) which served as a model for portions of the Maryland theft statute, and opined that it was "particularly instructive as to the purpose for the inclusion of the honest belief defense in its draft."

First, the commentary notes that "it seems important to make it clear beyond doubt that an honest belief that the property does not belong to another should be a defense to theft." ... Second, the commentary states that recklessness or negligence should not serve as a basis for theft liability.

*Sibert,* 301 Md. at 149, 482 A.2d 483, citing to and quoting from the Model Penal Code and Commentaries § 223.1 at 153–154.

■ We first must determine if the evidence adduced at the trial generated a jury issue as to whether Binnie "acted in the honest belief that he had the right to obtain or exert control over the property as he did." It is axiomatic that the weight of the evidence and the credibility of witnesses are always matters for the jury to determine when it is the trier of facts. *Perry v. State,* 234 Md. 48, 51, 197 A.2d 833 (1964); *Duffin v. State,* 229 Md. 434, 436, 184 A.2d 624 (1962); *Reynolds v. State,* 219 Md. 319, 326, 149 A.2d 774 (1959). *Cf. Attorney Griev. Comm'n v. Gilbert,* 307 Md. 481, 490, 515 A.2d 454 (1986). In our view, Binnie's testimony was sufficient to support fairly the issue whether he acted in an honest belief within the contemplation of Art. 27, § 343(c)(2). Whether the jury sitting as a trier of fact would lend any credence to Binnie or give any weight to his testimony was for the jury's determination, not that of the trial judge. The contradictions between Binnie's evidence and that of Tosadori went only to the weight of the evidence, not to its sufficiency. *Sibert,* 301 Md. at 152, 482 A.2d 483. *Compare Kucharczyk v. State,* 235 Md. 334, 201

A.2d 683 (1964). Simply put, the jury was free to discount or disregard totally Binnie's account of the incident and believe Tosadori's version. It was equally free, however, to discount or totally disregard Tosadori's account and believe Binnie's version. If the jury believed Binnie, the honest belief defense was generated by his testimony and operated as a total defense to the charge. We observe that such an issue may be generated by the testimony of the defendant alone; it is not necessary that his testimony be corroborated. *Smith*, 302 Md. 175, 180–181, 486 A.2d 196 (1985). We cautioned, quoting *Hudson v. State*, 381 So.2d 344, 346 (Fla.App.1980),

A defendant's testimony may not be totally disregarded merely because he is the defendant. His testimony must be weighed just as that of any other witness.

*Smith*, 302 Md. at 181, 486 A.2d 196.

As the trial judge observed, Binnie's acquisition of the hat "either happened the way the State said or it happened the way [Binnie] said." But the choice of which saga to believe lay with the jury, not the court. In short, under the circumstances and the factual situation presented by Binnie, it was within the province of the jury, not of the court, to determine whether Binnie should benefit from the honest belief defense, regardless of how dubious, suspect, far-fetched, and incredible Binnie's account may have appeared to the trial judge.

▪ Given that the honest belief defense was generated, the next question is whether Binnie was entitled to an instruction on that defense. We are satisfied that the requested instructions covered the honest belief defense. Binnie's counsel argued that defense to the jury. He declaimed that the decisive consideration was how Binnie viewed the situation. He emphasized:

If [Binnie] acted in good faith and honestly believed that he was entitled to do what he did then I would ask ... I would urge you to find him not guilty.

Md.Rule 4–325(c) provides:

The court may, and at the request of any party shall, instruct the jury as to the applicable law....[1]

This Court has held that the word "shall," as employed in the rule, renders the rule mandatory. *Smith v. State,* 302 Md. 175, 180, 486 A.2d 196 (1985). We noted in *Smith* at 179, 486 A.2d 196, quoting *Bruce v. State,* 218 Md. 87, 97, 145 A.2d 428 (1958), that

"it is encumbent upon the court, ... when requested in a criminal case, to give an ... instruction on every essential question or point of law supported by evidence."

In *Sims v. State,* 319 Md. 540, 550, 573 A.2d 1317 (1990), we held that

a defendant is entitled to have the jury instructed on any theory of defense that is fairly supported by the evidence, even if several theories offered are inconsistent.

We pointed out that this holding was not only consistent with the requirement of Rule 4–325(c) but also "with the general proposition that a defendant is entitled to an instruction on every essential question or point of law supported by evidence." *Id.* at 550, 573 A.2d 1317. Judge Wilner, now Chief Judge of the Court of Special Appeals, speaking for a panel of that court, put it this way:

The "bottom line" is that, if a *prima facie* case is generated on a particular point of law, the defendant is entitled to a jury instruction on that point.

*Wright v. State,* 70 Md.App. 616, 620, 522 A.2d 401 (1987). It follows that once the honest belief defense is fairly generated by the evidence, the trial court may not refuse the defendant's request to instruct the jury regarding it. We asserted in *Sibert,* 301 Md. at 154, 482 A.2d 483:

[W]hen the legislature explicitly enumerated four defenses to the crime of theft [the honest belief defense was one

---

1. Md.Rule 4–325(c) further provides that "[t]he court need not grant a requested instruction if the matter is fairly covered by instructions actually given." There is no suggestion that the instructions actually given here fairly covered the defense of honest belief.

of them] it intended a defendant to be entitled to a jury instruction on any defense generated by the evidence.

We hold that the trial judge erred in his failure to give an instruction on the honest belief defense. The judgment of the Court of Special Appeals is reversed. Binnie is entitled to a new trial.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED;

CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTION TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL;

COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY WASHINGTON COUNTY.