*Malcolm Jordan v. State*, No. 0436 of the 2019 Term, Opinion by Moylan, J.

**HEADNOTE:**

**MURDER AND CONSPIRACY – A RANDOM SHOOTING – WHAT DOES THE APPELLANT CONTEND? – PRECISELY, WHAT IS BEFORE US? -- VIDEOTAPE OF THE POLICE INTERVIEW – HYPOTHETICAL MERITS OF THE NON-CONTENTION – A BRIDGE TOO FAR – THE PRESUMPTION OF INNOCENCE – THE CONTINUING OBJECTION PHENOMENON – FIRST CONTENTION IN A NUTSHELL – DENIAL OF A MOTION FOR MISTRIAL – THE EVIDENCE IN QUESTION – POSSIBLE PREJUDICE – MISTRIAL MOTION – PROOF OF CONSPIRACY – THE PHENOMENON OF CUMULATIVE ERROR**

Circuit Court for Baltimore City
Case No. 117017002

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0436

September Term, 2019

_____

MALCOLM JORDAN

V.

STATE OF MARYLAND

_____

Leahy,
Shaw Geter,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.
Concurring Opinion by Leahy, J.

_____

Filed: July 14, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

What is the question? The straightforward task of figuring out what the answer is can frequently be far less of an appellate burden than figuring out what the question is. What precisely does this question ask? Is such a question even relevant? Even if so, has the question been timely preserved for appellate review? Even if so, is the question embraced by the contention actually before us? Again we ask, "What is the question?" The fundamental problem with this appeal is that the answers the appellant argues strenuously in favor of do not match up with the questions the appellant has asked. There is no coherent core to hold everything together.

**"Things fall apart; the center cannot hold."[1]**

\* \* \*

The appellant, Malcolm Jordan, was convicted in the Circuit Court for Baltimore City by a jury, presided over by Judge Marcus Z. Shar, of murder in the first degree, conspiracy to murder, the use of a handgun in the commission of a crime of violence, and the possession of a handgun by a prohibited person. On this appeal, he raises the following three contentions:

1. **Judge Shar erroneously admitted two items of allegedly prejudicial evidence;**

2. **Judge Shar erroneously denied the appellant's motion for a mistrial; and**

3. **The evidence was not legally sufficient to support the conviction for conspiracy.**

**A Random Shooting**

---

[1] William Butler Yeats, The Second Coming (1919).

The only seriously contested issue in this case was the identification of the appellant as the shooter. The circumstances surrounding the shooting were not, and are not, in dispute. The shooting occurred in broad daylight on September 27, 2016, immediately in front of an apartment building at 3505 Woodland Avenue in Baltimore City. The murder victim was Tony Williams, who was shot as he rode by on his bicycle in front of the building. He was shot numerous times in his back and legs. He was taken to the hospital by the police and underwent emergency surgery. He was subsequently released from the hospital but returned to the hospital on October 22, 2016, where he died of septic shock. The Medical Examiner concluded that the septic shock was the result of the gunshot wounds and ruled the death to have been a homicide.

At 3505 Woodland Avenue, the police had discovered that the shooting incident had been vividly recorded by multiple high-definition color surveillance cameras. The surveillance footage showed that shortly before the shooting, a car drove up and parked on a lot just outside the apartment building. Two men emerged from the vehicle and walked to the porch of the apartment. One of the two men, later identified indisputably as Charles McEachin, entered the building. The second man, the ultimate shooter, stayed outside and appeared to have borrowed a cigarette lighter from one Linda Phillips, a resident of the apartment building. Within several minutes, McEachin re-emerged from the building and handed the actual shooter a beer. When Tony Williams, the victim, rode by several minutes later, the shooter stepped out and shot him numerous times in the back and legs. McEachin, who had returned to his parked car immediately before the shooting, drove up to the

shooting scene. The shooter got into the front passenger seat and the two men sped away. There is no question as to "What happened?" The only question is "Who dunnit?" Who was the shooter?

The State conceded that the identity of the appellant as the shooter could probably not be adequately established by the surveillance tape alone. Two eyewitnesses, however, filled that gap. Charles McEachin, whom Linda Phillips had known for several years, was originally indicted along with the appellant as a co-conspirator. He was tried first in February of 2018. He was convicted of the possession of a firearm by a prohibited person but was acquitted of murder and conspiracy to murder. As a State's witness at the appellant's trial, he identified the appellant as the shooter. He also identified the appellant on the surveillance footage. He testified, moreover, that he had driven to 3505 Woodland Avenue with the appellant, whom he knew previously, and that he subsequently left the scene with the appellant after the shooting. Aside from routine but ineffective efforts to chip away at the weight of his identification, McEachin's establishment of the appellant as the shooter was essentially undamaged.[2]

---

[2] By today's standards, the identification of the appellant by McEachin would have been abundantly sufficient to have satisfied the burden of production and would also have been of very significant weight with respect to the burden of persuasion. At the time of the appellant's trial, however, McEachin's testimony, as the testimony of an undisputed accomplice, would not, under a venerable Maryland evidentiary rule that had prevailed from Luery v. State, 116 Md. 284, 81 A. 681 in 1911 through State v. James, 466 Md. 142, 216 A.3d 907 in 2019, have been enough to convict the appellant unless it had been independently corroborated. In this case, however, it was amply and abundantly corroborated by the testimony of Linda Phillips.

That century-old "accomplice corroboration rule" has since been abrogated by State v. Jones as of August 28, 2019. The new dispensation, however, operates only

3

The second, also essentially undamaged, identification of the appellant as the shooter was made by Linda Phillips. She identified the appellant without hesitation on the surveillance footage, in a double-blind pre-trial photographic array, and at the trial. She had not known the appellant before the day of the shooting. That identification by Linda Phillips coincidentally corroborated the identification by Charles McEachin. In its own right, however, it abundantly satisfied the State's burden of production and magnified its burden of persuasion. At all costs, the defense had to disparage the identification made by Linda Phillips. It tried mightily to do so. That trial strategy forms the context for the appellant's first contention.

## What Does The Appellant Contend?

What is the question? Presumably it is contained in the first contention, but the first contention is a troubling one. What is exasperatingly challenging is to try to fit the combined question and answer into a logical place within a coherent outline of the entire trial. A meaningful question demands a coherent context, as does a meaningful answer.

In the lengthy trial of the appellant, the key (the only) point of controversy was the credibility of the State's witness Linda Phillips. The defense went to extreme lengths, at times bordering on the bizarre, to impeach the credibility of Linda Phillips. Concomitantly, the State engaged in an arguably more than routine counter-measure to rehabilitate the credibility of Linda Phillips. As the heart of that rehabilitation effort, the Court played

---

prospectively and does not apply to the appellant's trial, which took place in November of 2018. Under the old rule or under the new rule, the result in the appellant's case would be exactly the same. The appellant does not now challenge that identification.

4

before the jury a 40-minute-long videotaped interview between the police and Linda Phillips. This entire impeachment-rehabilitation see-saw— including most especially the recorded police interview— was a distinct sub-division of the larger trial. It was, in a sense, a trial within a trial. It is, pertinently, the context for the appellant's first contention.

## Precisely, What Is Before Us?

In the language of politics, a good appellate contention should stay on message, and not spin off in centrifugal diffusion. What is before us on this appeal, however, is exasperatingly diffuse. We will focus on three distinct and independent, albeit arguably related, events that were all part of the impeachment-rehabilitation saga. The first is the 40-minute videotaped interview of State's witness Linda Phillips by Detective Jill Beauregard. The second and third are specific, allegedly prejudicial remarks made to Linda Phillips by Detective Beauregard in the course of that 40-minute interview. But what exactly is the contention?

## A. The Videotape Of The Police Interview (Not A Contention)

The context for the first contention arose out of the evidentiary ruling by Judge Shar permitting the State to play for the jury the 40-minute videotape of the interview between Linda Phillips and Detective Jill Beauregard. We discuss this ruling simply to set the scene for the contention that follows. The propriety of the ruling, however, is not itself a contention. It could have been a contention. We daresay the appellant would like it to be a contention. But it is most definitely not a contention. It does, however, set the stage for the contention. It is, however, a much larger stage than the contention actually raised. The opening page of the appellant's brief states the two-pronged contention as framed by him:

5

**I.    THE CIRCUIT COURT ALLOWED THE JURY TO HEAR HIGHLY PREJUDICIAL EVIDENCE.**

    **A.    A Key Witness's Safety Concerns Improperly Stoked the Jury's Fears**

    **B.    Beauregard's Comment That Defendants Normally Plead Guilty Vitiated the Presumption of Innocence.**

At the very outset of the appellant's argument in his brief, he reiterated the contention in precisely the same terms.

**I.    THE CIRCUIT COURT ALLOWED THE JURY TO HEAR HIGHLY PREDUCIAL EVIDENCE.**

    **A.    A Key Witness's Safety Concerns Improperly Stoked the Jury's Fears.**

    **B.    Beauregard's Comment That Defendants Normally Plead Guilty Vitiated the Presumption of Innocence.**

The contention thus framed explicitly refers only to two small snippets of allegedly prejudicial conversation contained within a much larger 40-minute-long segment of the trial. It does not embrace the larger procedural decision to allow the entire videotaped police interview to be played before the jury. The contention does not even refer to that larger and antecedent procedural issue. The very decision to hold a trial, for instance, is not ipso facto tainted by something prejudicial that might occur in the course of the trial. Nor is the decision to hold a significant segment of a trial ipso facto tainted by something prejudicial that might happen in the course of that trial segment. A contention narrowly focusing on a substantive part of the whole is not a contention adequately challenging the whole.

Albeit formally framing his contention in narrow substantive terms-- two precise items of allegedly prejudicial evidence-- the appellant devotes a significant portion of his "argument" to attacking the broader procedural question-- the antecedent decision to allow the playing of the entire 40-minute-long videotape. The analytic fuzziness of such an approach attempts to merge the broad procedural background question with any or all of its possible substantive consequences or sequelae. It is as if the appellant is trying to say, "But for the decision to play the videotape, the State would never have been in position to introduce the prejudicial evidence." That, of course, would be akin to asserting, "But for the Court's decision to let the State take the defendant to trial, the State would never have been in a position to violate his Miranda rights." To contend that Miranda was violated does not contend that the trial itself should never have occurred. The pleading requirements of an appellate "contention" are not so sweepingly lax and diffuse. We, therefore, hereby divorce the broad procedural decision to permit the playing of the videotape, which is not a contention before us, from all of the substantive instances that may have occurred in the course of that videotape, two of which do constitute the contentions before us.

## Hypothetical Merits Of The Non-Contention

In this case, however, we will assume for the moment, purely arguendo, that the broader procedural contention is actually before us. A surface glance reveals it would be a badly flawed contention in two regards. In stark contrast to Portia's quality of mercy[3], which was "twice-blest," the appellant's first contention would be "twice curst." In the first

---

[3] Shakespeare, The Merchant of Venice.

7

place, it is highly questionable whether the contention would even have been timely preserved for appellate review.

As the trial was winding down for the day on October 16, 2018, Linda Phillips was concluding her testimony. During a lengthy cross-examination, defense counsel had vigorously attacked her credibility, specifically her ability to identify the appellant, in a number of ways. The defense brought out (or attempted to bring out) that in the course of an earlier interview with the police, Linda Phillips had admitted that she was intoxicated at the time of the shooting and further that she was not paying close attention until the moment of the shooting. The defense also strongly insinuated that during that interview, the police had attempted to lure her into cooperation with the police by offers of financial assistance and help in relocating her residence. There was also strenuous disagreement between the defense and Linda Phillips about whether she wore glasses and about what she had told the police in that regard in the course of the police interview about whether she wore glasses.

As the Assistant State's Attorney concluded his then ensuing redirect examination, he informed Judge Shar that he was offering into evidence the videotape of the entire police interview, under Maryland Rule of Criminal Procedure 5-616, as a prior consistent statement in order to rehabilitate Linda Phillip's impeached credibility.

> ASSISTANT STATE'S ATTORNEY: Your Honor, under 5-616, the State's proposing to be allowed to play her statement, believing that the--
>
> THE COURT: Prior consistent statement?
>
> ASSISTANT STATE'S ATTORNEY: Yes.

8

THE COURT: <u>Okay</u>.

ASSISTANT STATE'S ATTORNEY: Thank you.

(Emphasis supplied.)

Maryland Rule 5-616(c)(2) provides:

(c) Rehabilitation. <u>A witness whose credibility has been attacked may be rehabilitated by</u>:
…
(2) Except as provided by statute, <u>evidence of the witness's prior statements that are consistent with the witness's present testimony, when their having been made detracts from the impeachment</u>.

(Emphasis supplied.) A minute or so later, the formal acceptance of the videotape took place.

ASSISTANT STATE'S ATTORNEY: Your Honor, <u>the State's going to move into evidence State's Exhibit Number 27</u>.

THE COURT: <u>All right</u>.

(Emphasis supplied.)

That ended the entire discussion. At no time on October 16, did the defense offer a word of protest or objection. The trial then recessed for the day. Neither then nor later did the defense attorney voice any objection to the use of the videotape as a legitimate measure to rehabilitate Linda Phillips's impeached credibility. Ordinarily, that would constitute an open and shut case of non-preservation. Maryland Rule 4-323(a) directs that "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for the objection become apparent. <u>Otherwise, the objection is waived</u>." (Emphasis supplied.) <u>Mills v. State</u>, 239 Md.App. 258, 280, 196 A.3d 497 (2018)("An objection, whatever its character, must still be timely."); <u>Williams v. State</u>,

9

131 Md.App. 1, 26, 748 A.2d 1 (2000)("When evidence is received without objection, a defendant may not complain about the same evidence coming in on another occasion even over a then timely objection.") If the rule is literally applied, that would do it for this unmade objection.

By the time the trial resumed on the following morning, however, defense counsel had rethought the matter. The "morning-after" objection, however, had nothing to do with the impeachment-rehabilitation issue but was solely on the wholly different basis that playing a 40-minute videotape was excessive as a rehabilitative measure and would give the State the benefit of having Linda Phillips identify the defendant twice. On this second, and admittedly less hectic, occasion for ruling on the videotape's admissibility, Judge Shar considered the defense objection and a made a ruling on the merits.

> THE COURT: Well, there are things I think the video can show that the testimony cannot and considerations that we, that the court instructs the jury that they should or can consider, and that includes the certainty or lack of certainty, the amount of time perhaps that it took, whether there was hesitancy, there was questioning about the glasses whether she seemed to be squinting or whatever.
>
> The objection is certainly preserved, but I'm going to have to overrule it, deny it, I'm sorry.

(Emphasis supplied.)

Almost all of the impeaching cross-examination had made reference to various events occurring in the course of the videotaped interview. Statements referred to on the videotape made by Linda Phillips were being used by the defense as prior inconsistent statements. As a rehabilitative proffer, the videotape was offered by the State as a set of prior consistent statements. Judge Shar recognized the pertinence of the entire interview.

10

Quite aside from its ultimate status as a viable contention, we are going to look for at least a passing moment, purely arguendo, at the possible merits of the contention. On the merits, we would see no remote abuse of discretion by Judge Shar in admitting the videotape for the purpose of rehabilitating impeached credibility. The videotape squarely refuted insinuation after insinuation suggested by the defense.

For yet another reason it is axiomatic that the twin substantive contentions raised on appeal are far from being a mere subset of the procedural objection actually argued, even if not timely so, at trial. Their respective purposes did not even correspond. At trial, the compelling strategy (realistically, the only strategy) was to challenge the identification of the appellant as the shooter by Linda Phillips. Accordingly, the defense argued that the playing of the 40-minute videotape should not be allowed, because that would emphasize that act of identification by allowing it to be made before the jury for a second time. That was the obvious and compelling trial strategy.

Appellate strategy, on the other hand, long divorced from the live pulse of the trial, frequently proceeds from a far different launching pad. As an academic exercise, appellate counsel pore over a transcript and try to spot targets of opportunity, whether those targets were really central to the trial or not. Neither of the twin contentions now being raised had anything remotely to do with Linda Phillips's identification of the appellant. Linda Phillips's apparent temerity to appear as a witness is now being exploited by the defense to show that the State was trying to intimate that the appellant was a bad and threatening person. That had nothing to do with the weight of the identification. Detective Beauregard's observation about the pleading habits of many criminal defendants, by the same token, is

11

now being characterized by the defense as an attack on the jury's belief in the presumption of innocence. That also has nothing to do with the identification of the appellant as the shooter. The two substantive sub-contentions are not lesser included aspects of the procedural argument made at trial. They had different and unrelated purposes. They were simply unrelated targets of appellate opportunism and were not embraced by the continuing objection that covered the playing of the videotape. It is also significant, moreover, that the appellant never requested that the videotaped police interview be reviewed and redacted before being played before the jury.

Whether, however, the appellant suffered the overruling of his motion 1) on the merits or 2) on the grounds of non-preservation or 3) on both is a matter of complete immateriality to the present appeal. The overriding mootness of the issue is made doubly clear by the fact that an attack on the very playing of the videotape has never been presented as a viable contention before us in any event. Any contention that the playing of the videotape itself was prejudicial, moreover, would have had no merit in any event.

## B. A Bridge Too Far

This brings us to the specific and allegedly prejudicial items that are the twin components of this double-barreled contention that is actually before us. The appellant contends that in the course of the videotape of the police interview of Linda Phillips, two instances of "highly prejudicial evidence" were played before the jury. Those two instances, however, are at the far, far edge, the Ultima Thule, of an extended tangent. Their relevance is attenuated to the extreme. In terms of even arguable relevance to the decision

12

to allow the playing of the videotape, they are simply a bridge too far. The first alleged error was:

> Evidence that Phillips, the State's essential witness, was afraid for her safety… was overwhelmingly prejudicial and created a clear possibility that the jurors voted to convict out of a misplaced desire to protect Phillips or themselves, instead of based on the evidence.

(Emphasis supplied.)

The appellant quotes several pages of abstract caselaw, condemning prejudicial and threatening remarks in other cases with no resemblance to this one. The prejudice in those cases inhered in threatening conduct on the part of defendants (or their adherents). There was no such conduct here. A word-by-word search of the appellant's entire sub-contention, moreover, quotes a scant eleven words from the entire videotape. Those words, moreover, were the words of Detective Beauregard and not those of Linda Phillips. We highlight them here in bold type.

> The jury witnessed an extended videotaped conversation during which a detective investigating the shooting at issue here told Phillips that people would "**TRY**" and "**HARASS**" her for cooperating with the police, that "**I DEFINITELY KNOW YOU ARE CONCERNED ABOUT YOUR SAFETY.**"

The appellant reads far more into those eleven words than we can read into them. He asserts:

> This improperly admitted evidence thus created a risk that the jury convicted Jordan in order to protect a frightened witness; caused the jurors to weigh their own safety in rendering a verdict; and implied that Jordan was dangerous and thus likely guilty.

(Emphasis supplied.)

The appellant concludes this segment of his argument:

13

> On this record, <u>it is impossible to conclude that fear had no effect on the jury's decision making</u>. <u>The circuit court erred</u> by allowing the jury to hear about witness's fears, and <u>by allowing jurors whose impartiality might have been compromised to determine Jordan's guilt</u>.

(Emphasis supplied.)

On the hypothetical merits, we conclude that the appellant has attributed to Linda Phillips an apprehension that Linda Phillips never herself articulated. In developing and in arguing that sub-contention, the appellant has not quoted a single word uttered by Linda Phillips. Why any nervousness or apprehension on the part of Linda Phillips about appearing as a witness, moreover, even if it existed, would generate fear in the jurors is in no way suggested. The appellant, however, leaps to just such an assumption. Most significantly, no threatening word or gesture on the part of the appellant, his family, or his friends was in any way suggested. To generate prejudice against the appellant, some misconduct on the part of the appellant (or his adherents) would be required. The quoted passage does not suggest any such misconduct. Spontaneous apprehension on the part of a witness, even if present, does not suffice. We see no merit in a free-wheeling symptom absent a well-diagnosed cause.

The nervous anxiety of the witness does not <u>ipso</u> <u>facto</u> establish misbehavior on the part of the appellant. In a converse scenario, an obliviousness to danger by the witness would not preclude misbehavior on the part of a defendant. The internal state of mind of the witness is simply irrelevant unless it can be related to an external cause.

Having concluded that there is not a scintilla of merit in this entire sub-contention, it is almost cruel to note that even if, <u>arguendo</u>, there had been, there was no objection and

14

nothing in this regard was remotely preserved for appellate review. Throughout the playing of this part of the videotape, the defendant did not raise an eyebrow. Yet it wishes to charge Judge Shar with the duty to listen with rabbit ears and to pounce _sua sponte_ at any vague inference or allusion. We will return to this issue of non-preservation _infra_ as we consider the second sub-contention.

## C. Presumption Of Innocence

The second and final of the two sub-contentions virtually accuses the State of attempting to strike a lethal blow at the Magna Charta itself. The appellant alleges that the 40-minute videotape told the jury that they did not have to give the appellant the presumption of innocence. In terms of its gravity, the appellant waves the bloody flag of this contention as if the words of Detective Beauregard on the videotape threatened to destabilize the very tectonic fault line beneath the field at Runnymede. The edifice of justice is trembling. The detective's actual words, however, were not nearly so seismic.

In the police interview, Detective Beauregard attempted to reassure Linda Phillips that her identification of the appellant would not be made known to the appellant unless there was a trial. If, as frequently happens, there was a guilty plea by the appellant, there, of course, would be no trial. When Linda Phillips sought reassurance that her identification of the appellant would remain anonymous, Detective Beauregard replied:

> Absolutely. Absolutely. So the only way the individual would know, providing he is in the photo array, is if it ever went to court, and most of the time these people plea out. So when you plea they never hear, they never know anything. They just accept the plea and go to jail. If he, you know, asks for a trial then, of course, at that time, which is usually at least a year down the road, we have to make that information available to his public defender

15

<u>or lawyer</u>, but unless you say something the police department does not release that information.

(Emphasis supplied.)

Detective Beauregard's observation about many or most arrestees ending up by pleading guilty has absolutely nothing to do with the presumption of innocence. The appellant did not enter a guilty plea. The appellant pleaded "Not guilty" and elected to go to trial, wherein he enjoyed the full benefit of the presumption of innocence. The presumption of innocence means simply that at a criminal trial, the State carries the complete burden of proving all elements of the crime against the defendant beyond a reasonable doubt. The presumption does not apply to those who plead guilty and who, therefore, do not go to trial. Defendants at the trial table are presumed to be innocent. Arrestees generally, by contrast, are not presumed to be innocent, nor are defendants who have entered guilty pleas.

In <u>Williams v. </u>State, 322 Md. 35, 41, 585 A.2d 209 (1991), Judge Orth spoke for the Court of Appeals in describing the presumption of evidence.

> The "**presumption of innocence**" is in truth merely another form of expression for a part of the accepted rule for the burden of proof in criminal cases, i.e., the rule that it is for the prosecution to adduce evidence and to produce persuasion beyond a reasonable doubt.

(Emphasis supplied.)

In <u>Evans v. State</u>, 28 Md.App. 640, 349 A.2d 300 (1975), this Court undertook an extensive and intensive review of such evidentiary terms as burden of proof, inference, and presumption. We pointed out that of the five legally recognized meanings of the word

16

"presumption," one of them was "presumption of innocence." With respect to it, we set out

the pertinent national law with respect to it at 28 Md.App. 676, n. 13.

> The '**presumption of innocence**' is, of course, not a **presumption** at all. 9 Wigmore on Evidence (3rd Ed. 1940), s. 2511, points out at p. 407, '(t)he '**presumption of innocence**' is in truth merely another form of expression for a part of the accepted rule for the burden of proof in criminal cases, i.e. the rule that it is for the prosecution to adduce evidence . . . and to produce persuasion beyond a reasonable doubt . . .' Thayer, Preliminary Treatise on Evidence (1898), is equally clear, at p. 551, 'In the first place, the so-called **presumption of innocence** is not, strictly speaking, a **presumption** in the sense of an inference deduced from a given premise. It is more accurately an assumption which has for its purpose the placing of the burden of proof upon anyone who asserts any deviation from the socially desirable ideal of good moral conduct.' And see Morgan, Basic Problems of Evidence (1962), p. 44.

> If the '**presumption of innocence**' were a true presumption of law or permitted inference of fact, it would be flagrantly unconstitutional under Leary v. United States, supra, and other cases requiring that a **presumption** be based upon a mathematical probability that it be true. Quite the reverse likelihood, of course, applies to one arrested, indicted and brought to trial. As McCormick, The Law of Evidence (1954), astutely pointed out, at 647-648: '(W)hen it came to be employed, in argument and in instructing juries, in criminal trials under the common law, it became a source of mysticism and confusion. As applied to the accused, any assumption, or '**presumption**' of **innocence**, in the popular sense of an inference based on probability, is absurd. The probability is the reverse. The assumption of **innocence** which is reasonable in the absence of contrary facts becomes quite unrealistic when we include in the picture the facts that the person has been officially charged with the crime and has been brought to trial. Nevertheless, the phrase '**presumption of innocence**' has been adopted by judges as a convenient introduction to the statement of the burdens upon the prosecution, first of producing evidence of the guilt of the accused and, second, of finally persuading the jury or judge of his guilt beyond a reasonable doubt.'

On the merits of the present sub-contention, the irrelevance of Detective

Beauregard's quoted remarks is twice compounded. In the first place, the quoted remarks

have absolutely nothing to do with the presumption of innocence. In the second place, any

17

possible reference to the presumption of innocence has absolutely nothing to do with the appellant in this case.

### The Continuing Objection Phenomenon

With respect to both of these sub-contentions— Detective Beauregard's allegedly prejudicial allusions to 1) the apprehension of Linda Phillips at making an identification and 2) the tendency of many defendants to plead guilty— there was no objection when those parts of the videotape were played and nothing, therefore, has been preserved for appellate review. The appellant attempts to sidestep the preclusive effect of non-preservation by claiming that both of these situations were embraced within his continuing objection.

To be sure, when on the morning of October 17, 2018, Judge Shar ruled for the second time that the 40-minute videotape would be received in evidence, defense counsel requested, "I just want the court to grant me a continuing objection… to the playing of the video so I don't have to stand up and object every time." Judge Shar replied, "Absolutely." Based upon that, the appellant now claims that neither of these ensuing objections to prejudicial evidence is vulnerable to the charge that it had not been preserved for appellate review. They were embraced, according to the appellant, within the continuing objection that he was granted. The appellant's brief expressly asserted, "Those errors were preserved by defense counsel's continuing objection to Phillips's video."

That argument has an instinctive surface appeal, but will it hold up under closer examination? Let us, therefore, look more closely at the procedural phenomenon of the continuing objection. The appellant badly misreads the continuing objection procedural

device. Defense counsel's only expressed objection to the videotape was to its allegedly excessive scope, allowing the State to have Linda Phillips's identification made a second time. The continuing objection relieved defense counsel of the obligation of having to repeat that particular objection again and again throughout the 40-minute videotape. That is the purpose of a continuing objection. It is Rule 4-323(b) that provides for the continuing objection. The rule itself makes it clear that for appellate review purposes, an objection, to qualify for inclusion as part of a continuing objection, must be "clearly within its scope."

> (b) **Continuing Objections to Evidence**. At the request of the party or on its own initiative, the court may grant a continuing objection to a line of questions by an opposing party. For purposes of review by the trial court or on appeal, <u>the continuing objection is effective only as to questions clearly within its scope</u>.

(Emphasis supplied.)

In <u>Kang v. State</u>, 393 Md. 97, 119-20, 899 A.2d 843 (2006), Judge Harrell referred to the rule:

> Consequently, Maryland Rule 4–323(b), adopted in 1984, was created to provide a trial judge with the discretion to grant a continuing objection and thus obviates the need to object persistently to similar lines of questions that fall within the scope of the granted objection: "At the request of a party or on its own initiative, the court *may grant* a continuing objection to a line of questions by an opposing party. <u>For purposes of review by the trial court or on appeal, the continuing objection is effective only as to questions clearly within its scope</u>."

(Emphasis supplied.)

The same objection does not have to be repeated. Different objections, however, to very different evidentiary issues, such as these allegedly prejudicial remarks now before us, are by no means rendered unnecessary. They were not within the scope of the original

19

objection. A privilege not to have to **repeat** an objection already made is by no means a license never to have to make an objection in the first instance. The relief from not having to repeat is a relief from **reiteration**, not from the initial **iteration**. "You don't have to repeat that argument" does not mean, "You don't have to make it in the first place."

The clincher for the proposition that the continuing objection, albeit indulgent on the time line, is just as substantively constrained as is a one-time objection is self-evident from the animating philosophy giving rise to the preservation requirement itself. As the caselaw has made transparently clear over the decades, the intended beneficiary of the preservation requirement is the trial judge. The preservation requirement is intended to prevent the trial court from being sandbagged by unseen error. The appellate court will not entertain a hidden error as the basis for a reversal. What is required is a timely and clearly stated objection made to the trial court so that the court has an opportunity to consider the issue and to correct the error. Appellate refusal to take notice of an unpreserved objection is not an exclusionary or cathartic measure. It is not intended to punish the negligent party nor reward the diligent. It is first, last, and always an insistence that the trial court has been given the opportunity to correct its own error.

Early in the life of this Court, Chief Judge Robert C. Murphy (later Chief Judge of the Court of Appeals) stated in <u>Parker v. State</u>, 4 Md.App. 62, 67, 241 A.2d 185 (1968):

> The reason for the rule requiring objection as a prerequisite to appellate review is a salutary one, being <u>designed to afford the trial judge an opportunity to correct inadvertent omissions or inaccuracies</u> in his instructions, where the alleged error is one that might have been readily corrected if it had been called to the trial judge's attention.

(Emphasis supplied.) See also White v. State, 8 Md.App. 51, 258 A.2d 50 (1969); Anderson v. State, 12 Md.App. 186, 203, 278 A.2d 439 (1971).

Much earlier on, the Court of Appeals had explained in Canter v. State, 220 Md. 615, 617, 155 A.2d 498 (1959), that the rule:

> was designed to afford the trial judge an opportunity to correct inadvertent omissions or inaccuracies in a charge, and that we would not exercise our right to 'take cognizance of and correct any plain error material to the rights of the accused,' of our own motion, if the alleged error was one that might have been readily corrected if it had been called to the trial judge's attention.

(Emphasis supplied.)

In Reynolds v. State, 219 Md. 319, 324-25, 149 A.2d 774 (1959), the Court of Appeals, even in a case involving plain and material error, refused to entertain the issues because:

> In this case it is obvious that the errors complained of are such that the trial court could have—and undoubtedly would have—corrected if the defendant had interposed her objections, as she should have done, before the jury retired to consider its verdict.

(Emphasis supplied).

Bennett v. State, 236 Md. 562, 568, 188 A.2d 142 (1963) was a case involving an error in jury instructions. The Court of Appeals pointed out:

> The purpose of Maryland Rule 756(f)— which requires that objections to instructions shall be made before the jury retires to consider its verdict— is to give the trial court an opportunity to amplify or amend its charge if it deems amplification or amendment necessary.

(Emphasis supplied.)

In Vernon v. State, 12 Md.App. 157, 163, 277 A.2d 635 (1971), Judge Powers wrote for this Court:

21

It is clear that <u>the purpose and design of the rule is to correct errors while the opportunity to correct them still exists. Only thus is an error preserved for appellate review.</u>

It is *not* the purpose and design of the rule to provide an avenue for a party to lay away ammunition in the arsenal of appeal.

(Emphasis supplied.)

In the case now before us, neither Linda Phillips's expression of fear for her safety nor Detective Beauregard's alleged disparagement of the presumption of innocence, both uttered in the course of the 40-minute videotape, were ever remotely brought to Judge Shar's attention for any action by him. Particularly pertinent, therefore, are the words of Chief Judge Gilbert for this Court in <u>Leatherwood v. State</u>, 49 Md.App. 683, 694-95, 435 A.2d 477 (1981):

<u>Faced with the indistinct exception articulated in the instant case, the judge was left</u>, as are we, <u>to speculate as to the specific grounds of the objection and, thus, had no opportunity to correct, modify, or clarify his jury instructions</u>, if such action was, in the judge's view, warranted.

(Emphasis supplied.)

In <u>Austin v. State</u>, 90 Md.App. 254, 265, 600 A.2d 1142 (1992), this Court summed up the purpose of the rule:

<u>Where the judge could easily have corrected the error if it had been drawn to his attention, the Court generally will not consider the contention.</u>

(Emphasis supplied.)

The initial objection to the playing of a 40-minute tape did not in any way alert Judge Shar to the two items of allegedly prejudicial conversation that the appellant now objects to. They are not embraced within some larger "but for" totality. There is, moreover,

22

an inherent danger in "but for" reasoning. A false syllogism could easily assert, "But for the trial, there could be no trial error; trial error is a result of the trial. To have made timely objection to the trial, therefore, is to have made timely objection to any error that may occur in the course of that trial." The Aristotelian syllogism, however, does not bridge over so yawning a chasm between cause and effect. The continuing objection phenomenon does not bridge such a gap. By objecting broadly to the very forum itself, a defendant does not create an evidentiary zone wherein no further objection is necessary, a place of solace and silence "where seldom is heard a discouraging word."[4] To object to the breadth of a 40-minute videotape is not ipso facto to object to anything and everything that might be said in the course of those forty minutes.

The granting of a continuing objection will extend the viability of the objection temporally. It will not widen the breadth of the objection substantively. It does not cover at the end of its lifespan anything that it did not cover at its outset. **A continuing objection does not become a wild card**. Neither of the latter-day complaints the appellant is now raising were brought to Judge Shar's attention here. They are not preserved for appellate review and the continuing objection theory will not give them a life they never had.

### First Contention In A Nutshell

We, therefore, reject the appellant's first contention. That is an easy call. Our efforts to explain that call, however, have been admittedly laborious. There is a lesson in that.

---

[4] Daniel Kelley and Brewster Higley, "Home on the Range" (c. 1910). "… and the skies are not cloudy all day."

As illustrated by this case, a recurring problem of appellate review has been that of how to deal with procedural **sprawl**. The challenge is that of reducing the **sprawl** into a coherent outline. Sometimes, however, the **sprawl** is hard to reduce. A coherent trial outline for purposes of appellate review demands a necessary agreement between the contested issue at trial and the resolution of that issue on appeal. Absent such agreement, the appellate court is tasked with the mission impossible of comparing apples with oranges. That, however, is a mission that the appellate court should not and will not do.

In this case, the required agreement between the issue at trial and the issue on appeal is completely missing. The contested issue before the trial court was the admissibility of a 40-minute videotape. The only reasons offered in support of the objection to admissibility were 1) the length of the videotape and 2) the fact that the jury would see and hear the witness identify the appellant for a second time. By contrast, the only issue argued on appeal is that two allegedly prejudicial items—1) the fear espoused by the witness and 2) the detective's alleged disparagement of the presumption of innocence—occurred in the course of the videotape.

Just such an absence of agreement between the issue at trial and the issue on appeal was before this Court in <u>Jeffries v. State</u>, 113 Md.App. 322, 688 A.2d 16 (1997). In that case at least, the contested admissibilities had concerned the same piece of evidence, a previous gunshot wound suffered by the appellant. The argument against admissibility offered at trial, however, and the very different argument against admissibility offered on appeal fatally invalidated the appellate argument.

24

> Although defense counsel objected to the evidence at trial, he did so only on the ground of relevancy. He raises for the first time on appeal the argument that the evidence should have been excluded on the grounds of other crimes or other bad acts evidence. As this Court has previously held, "when the grounds for an objection are stated by the objecting party, either on a volunteered basis or at the request of the court, only those specifically stated are preserved for appellate review; those not stated are deemed waived." *Banks v. State,* 84 Md.App. 582, 588, 581 A.2d 439 (1990); *see also Brecker v. State,* 304 Md. 36, 39–40, 497 A.2d 479 (1985). Therefore, we need not explore the merits of the appellant's contention.

113 Md.App. at 341. (Emphasis supplied.)

The dichotomy between the trial court issue and the appellate court issue could not be bridged:

> An objection to the admission of evidence on the ground of irrelevance is by no means the same thing as an objection to evidence on the ground of unfair prejudice… At trial, the appellant objected on the ground of irrelevance but that objection has not been pursued on appeal. On appeal, by contrast, the appellant's argument is exclusively one of prejudice of the "other crimes" evidence variety, but that objection was not preserved for appellate review.

113 Md.App. at 342. (Emphasis supplied.) In Jeffries, this Court encapsulated in a nutshell our reason for rejecting the appellant's first contention here:

> **The argument that was preserved is not being pursued; the argument that is being pursued was not preserved**.

Id. (Emphasis supplied.) Thus it is in the case now before us.

### Denial Of A Motion For Mistrial

The appellant's second contention is also rent by infirm procedural fault lines. Its reasoning consists of three parts. It ultimately collapses into a single issue, however, for if the appellant does not prevail on his ultimate conclusion-- that he is entitled to the grant of a mistrial-- it does not matter whether he prevails on the antecedent sub-issues or not. If he

has not been prejudiced and is not entitled to any relief, his requested sanction of a mistrial would self-evidently not prevail. If, on the other hand, he did suffer some prejudice at the hands of the State but that prejudice was not grievous enough to justify so severe a sanction as a mistrial, his requested sanction of a mistrial would still not prevail. In this case, his requested sanction of a mistrial fails-- for both reasons. That makes our ultimate decision easy. It makes the setting out of all of the reasons for that decision, however, more tedious than otherwise should have been necessary. The full contention is:

**II. THE STATE'S UNSUPPORTED RETALIATION THEORY CONFUSED THE ISSUES AND CAST JORDAN AS A VIOLENT PERSON.**

    **A. Evidence of an Unrelated Shooting was Inadmissible.**

    **B. The Retaliation Theory was Highly Prejudicial.**

    **C. A Mistrial was the Only Cure for this Prejudice.**

**A. The Evidence In Question**

Realistically, the only significant issue in this case was the identity of the appellant as "the shooter." The State had an absolutely solid case in that regard through the testimony of both Charles McEachin and Linda Phillips. There was no evidence that the appellant was not the shooter. To be sure, no motive was ever shown for the shooting. No motive, of course, need be shown. Had such a motive been shown, it would have made the State's solid case of identification even more solid, for whatever value such superfluity might have had.

Had the State been permitted to offer and to develop its apparent and initial theory that the appellant indeed had a motive for the killing of the victim, to wit, in retaliation for

another shooting, about one year earlier in which the appellant had been the shooting victim, that unnecessary excess might, indeed, have resulted in a trial error on the part of the State. Fortunately, however, from the State's point of view, defense counsel and Judge Shar combined to save the State from such excess.

On the first day of trial, Detective Alton McCallum, the primary investigator assigned to the shooting, described the initial trajectory of the investigation. The appellant was not yet in custody. Charles McEachin, however, was in custody, because Linda Phillips had been able to identify him by name. Detective McCallum listened to a series of phone calls that McEachin made from jail. Those calls, in turn, led the police to "review a homicide case that was spoken about" in the phone calls involving a fatal and a non-fatal victim of a shooting in the 3400 block of St. Ambrose Avenue a little more than a year earlier. Before the jury, on October 10, 2018, the critical but limited conversation was:

> [THE STATE]: And you had identified Raytheon Parker as the homicide victim in that case. <u>Who was the non-fatal victim in that case</u>?
>
> [DEFENSE COUNSEL]: <u>Objection</u>.
>
> THE COURT: <u>Overruled</u>.
>
> [MCCALLUM]: <u>The non-fatal victim was Malcolm Jordan</u>.
>
> [THE STATE]: And do you know whether or not Mr. Jordan was cooperative in that investigation?
>
> [MCCALLUM]: No, he was not.
>
> [THE STATE]: And why do you say that?
>
> [MCCALLUM]: Detectives went to go speak with him—
>
> [DEFENSE COUNSEL]: I didn't hear your answer. I didn't hear that answer.

27

[CLERK]: No, he was not.

[DEFENSE COUNSEL]: Okay.

[THE STATE]: And how do you know that, or why do you say that?

[MCCALLUM]: The Lotus Notes entry, when the detectives went to go speak with him, he refused to answer any questions.

[THE STATE]: Okay. And you indicated this was 16H0047 and the 16 refers to the year 2016?

[MCCALLUM]: Yes.

[THE STATE]: Do you know what month the shooting occurred in?

[MCCALLUM]: March.

(Emphasis supplied.)

It was over one week later, on October 18, 2018, that defense counsel raised the subject again with a request for a curative instruction. Defense counsel argued that the State had not been "able to tie up or connect the March 2016 shooting with a motive," and therefore, "we need to instruct the jury that they are to strike that from their memory and… it should have no place in their deliberations." When the prosecutor pointed out that the requested curative instruction might highlight the testimony, Judge Shar asked whether defense counsel still wanted the instruction if the court was going to rule that the entire testimony about the earlier shooting "cannot be mentioned in closing arguments." Defense counsel indicated that the alternative solution was "appealing" and asked for time to consider it. When proceedings before the jury resumed, Judge Shar announced that the

28

State had not established an adequate nexus between the two shootings and ruled, "I'm going to exclude it."

After some intervening discussion about jury instructions and after the appellant's decision not to take the stand, defense counsel, very half-heartedly, made a request for a mistrial:

> [DEFENSE COUNSEL]: Your Honor, in my client's behalf, <u>this business about his being shot, for whatever reason, is a – has focused a lot of attention in his mind on that and so he particularly objected to the portion of the testimony involving that incident that he was uncooperative</u>. <u>He really takes offense to that</u>. And because of that, <u>he has asked me to ask the Court -- or he has asked me to request of the Court to grant a mistrial on that testimony, but I have no further argument to make than I have already made</u>.
>
> THE COURT: Okay, I'm going to have to deny the motion based on the law as I understand it.
>
> [DEFENSE COUNSEL]: I've explained to my client that we have, I guess for want of a better word, a compromised position on how that testimony will be handled. <u>It's my understanding that Counsel has been instructed that neither side can bring that incident up</u>.
>
> THE COURT: <u>Correct</u>. <u>And I won't give a curative instruction</u>.
>
> [DEFENSE COUNSEL] <u>Right</u>. <u>Right</u>.
>
> THE COURT: <u>Okay</u>.

(Emphasis supplied.)

Defense counsel then explained to the appellant, on the record, that "the reason I'm not requesting a curative instruction is… they may have forgotten it already." During closing arguments, neither side mentioned that the appellant had been shot in the earlier shooting. A note from the jury, however, did inquire:

29

Detective McCallum mentioned listening to jail calls that involved Malcolm Jordan as a victim. The crime occurred in March 2016. This detail is admissible in our deliberation, correct?

With respect to the reply, Judge Shar announced to counsel:

I wrote, "No, that fact should not be considered."

At that point, defense counsel indicated no disagreement with Judge Shar's handling of the question and requested no further relief. If anything was remotely preserved for appellate review, it was the unadorned fact that the appellant had been the victim of a shooting in March of 2016. The fact that the appellant had been uncooperative, the thing to which the appellant particularly objected, had not been objected to and was clearly not preserved for appellate review.

Our reading of the transcript is that even the limited reference to the appellant as the "non-fatal victim" of the March 2016 shooting was not admitted into evidence. After extended discussion at the bench on October 18, 2018, Judge Shar announced as the trial before the jury resumed that the State had not established an adequate nexus between the two shootings. He said, "I'm going to exclude it." When a note from the jury subsequently inquired about the earlier shooting, Judge Shar announced to counsel that his response to the jury had been, "I wrote, 'No, that fact should not be considered.'" The challenged reference was thus expressly excluded from evidence and the jury was further instructed that it should not consider it. The appellant's argument blithely ignores that.

## B. Possible Prejudice

How then was the appellant prejudiced by such non-evidence? In his appellate brief the appellant places his argument in this regard under the sub-heading, "The Retaliation

30

Theory Was Highly Prejudicial." What Retaliation Theory? The bottom line is that the jury never heard about a so-called Retaliation Theory. Both defense counsel and the Assistant State's Attorney argued such a theory, to be sure, in front of Judge Shar at the bench, but the issue is not whether Judge Shar was prejudiced by it. He was not, for he utterly rejected it. Prejudice presupposes that the jury heard something and was adversely affected by it. The jury never heard a word about the Retaliation Theory. Short of arguing the Retaliation Theory, the appellant in his brief went on about the flaws in one's character evidenced by one's having been shot.

> As defense counsel argued below, [not before the jury but at the bench], evidence of a prior shooting showed "that [Jordan] hangs around people with guns. People with guns are angry at him." This created a powerful association between Jordan and a criminal element. Simply placing Jordan in the context of a shooting in a "historically violent" neighborhood where people "keep dying" created a risk the jury would conclude that if Jordan was shot one day and charged with a shooting the next,[there was no evidence that the appellant was ever charged with anything] he must simply lead a violent life, and that he must have been doing something bad if he was shot.

(Emphasis supplied.)

On April 14, 1865, Abraham Lincoln was shot in Ford's Theatre, Washington. On November 22, 1963, John Kennedy was shot on the streets of Dallas, Texas. To suggest that because of those shootings, Abraham Lincoln and John Kennedy were ipso facto shown to be part of a "criminal element" associated with guns and violence defies both law and logic. The fervid defense imagination, moreover, goes on to make the shooting victim, ipso facto a member of a warring gang.

> By inviting the jury to imagine Jordan as a dangerous person involved in a war between factions, the State's unproven retaliation theory served no purpose but to stir up the same connotations.

31

(Emphasis supplied.)

Even to argue this, however, overlooks the overarching fact that testimony that the appellant was the victim of a shooting never ultimately made it into evidence. It was twice excluded. Even if the evidence had not been excluded, however, evidence that the appellant had been the victim of a shooting a year earlier would not be evidence that the appellant was out to shoot a member of a rival gang in retaliation for the earlier shooting. The so-called prejudice is based on nothing but hyperbolic imagination.

## C. Mistrial Motion

The motion for a mistrial at the trial level is very much akin to the issue of harmless error at the appellate level. In each case, the existence of an error is not in issue. What is in issue in both cases is, rather, the egregiousness of the error. In no lengthy and hard-fought case has there ever been a perfect trial. Some bumps and scrapes and abrasions are inevitable. In both fora, however, trial and appellate, an overarching sense of balance is required. Is the error unfortunate? To be sure! But is the error's likely consequence an adverse effect or influence on the trial result? Frequently not. Is the error so severe as to justify the extreme sanction of aborting the entire trial process and starting over again? That is the question.

At the appellate level, if the majority of the judges are persuaded beyond a reasonable doubt that the error did not adversely influence the verdict, the error will be deemed harmless rather than reversible. At the trial level, if the trial court believes in its discretion that the error did not adversely affect the verdict, the motion for a mistrial will

be denied. At neither level, on this ultimate issue, do the judges deny the existence of the error. At each level, they assess the likely consequence of the error. What are the guidelines for that assessment?

On the subject of granting a mistrial, the caselaw is abundant. In Carter v. State, 366 Md. 574, 591, 785 A.2d 348 (2001), the Court of Appeals pointed out:

> The grant of a mistrial is considered an extraordinary remedy and should be granted only if necessary to serve the order of justice.

(Emphasis supplied.) See also Klauenberg v. State, 355 Md. 528, 555, 735 A.2d 1061 (1999).

This Court has spoken to the same effect. In Choate v. State, 214 Md.App. 118, 133, 75 A.3d 1003 (2013), we observed that a mistrial is

> …an extreme sanction that sometimes must be resorted to when such overwhelming prejudice has occurred that no other remedy will suffice to cure the prejudice.

(Emphasis supplied.)See also Behrel v. State, 151 Md.App. 64, 142, 823 A.2d 696 (2003); Washington v. State, 191 Md.App. 48, 99, 990 A.2d 549 (2010)("In order to warrant a mistrial, the prejudice to the accused must be real or substantial; a mistrial should never be declared for light or transient reasons."); Wilson v. State, 148 Md.App. 601, 666, 814 A.2d 1 (2002). And see Colvin-el v. State, 332 Md. 144, 160, 630 A.2d 725 (1993); Rainville v. State, 328 Md. 398, 408, 614 A.2d 949 (1992); State v. Hawkins, 326 Md. 270, 277, 604 A.2d 489 (1992). Our standard of review, moreover, could not be more clear. "An appellate court will not reverse a denial of a mistrial motion absent a clear abuse of discretion."

Winston v. State, 235 Md.App. 540, 570, 178 A.3d 643 (2018); Parker v. State, 189 Md.App. 474, 483, 985 A.3d 72 (2009).

In denying the motion for a mistrial in this case, Judge Shar had before him a situation in which 1) there was no error, and 2) there was no prejudice. In deciding, therefore, not to abort the lengthy trial on the basis of non-prejudicial non-error, he did not even risk abusing his discretion.

## Proof of Conspiracy

With the appellant's third contention, we are asked a straightforward question: "Was the State's evidence legally sufficient to support the conspiracy conviction?" Gratefully, we respond with a straightforward answer: "Yes, it was."

In assessing legal sufficiency, we have no problem with the facts in this case. The facts are undisputed. The only issue is that of whether these uncontroverted first-level facts could lead to a conclusion that a criminal conspiracy existed between the appellant and Charles McEachin. Do these facts provide an adequate predicate for a reasonable inference that a conspiracy between them existed? An inference "need only be reasonable and possible; it need not be necessary or inescapable." Cerrato-Molina v. State, 223 Md.App. 329, 338, 115 A.3d 785 (2015). See also Neal v. State, 191 Md.App. 297, 318, 991 A.2d 159 (2010). In Khalifa v. State, 382 Md. 400, 436, 855 A.2d 1175 (2004), the Court of Appeals provided a good working definition of a criminal conspiracy.

> A criminal conspiracy consists of the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. The essence of a criminal conspiracy is an unlawful agreement. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design. In Maryland,

the crime is complete when the unlawful agreement is reached, and no overt act in furtherance of the agreement need be shown.

(Emphasis supplied.) See also <u>Carroll v. State</u>, 428 Md. 679, 696-98, 53 A.3d 1159 (2012).

From such phrases as "a meeting of the minds" or "a criminal contract," however, the appellant seeks to impose the rigidity of contract law onto the law of criminal conspiracy. In this case, to be sure, there was no formal or express offer and acceptance between the appellant and Charles McEachin, but there need not be. Only rarely-- perhaps in the agreement for a contract killing, perhaps in recruiting a new adherent for a well-established criminal enterprise-- would the meeting of the minds satisfy a Samuel Williston or an Arthur L. Corbin. In most criminal conspiracies, however, the common purpose is informal and implied rather than something expressly articulated. As this Court explained in <u>Jones v. State</u>, 132 Md.App. 657, 660, 753 A.2d 557, <u>cert.</u> <u>denied</u> 360 Md. 487, 759 A.2d 231 (2000).

> There is frequently <u>no direct testimony</u>, from either a co-conspirator or other witness, <u>as to an express oral contract of an express agreement to carry out a crime</u>.

(Emphasis supplied.) With respect to the nature of the proof of such an informally established or constructive meeting of the minds, <u>Jones</u> went on, 132 Md.App. at 660:

> It is a commonplace that <u>we may infer the existence of a conspiracy from circumstantial evidence</u>. If two or more persons act in what appears to be a concerted way to perpetrate a crime, <u>we may, but need not, infer an agreement by them to act in such a way. From the concerted nature of the action itself, we may reasonably infer that such a concert of action was jointly intended. Coordinated action is seldom a random occurrence</u>.

(Emphasis supplied.) See also Mitchell v. State, 363 Md. 130, 145, 767 A.2d 844 (2001).; Darling v. State, 232 Md.App. 430, 466-67, 158 A.3d 1065 (2017); Carroll v. State, 202 Md.App. 487, 506, 32 A.3d 1090 (2011) (A "meeting of the minds" may be shown "by circumstantial evidence from which an inference of common design may be drawn.")(Emphasis supplied.); Alston v. State, 177 Md.App. 1, 42, 934 A.2d 949 (2007), aff'd 414 Md. 92, 994 A.2d 896 (2010).

Clearly such circumstantial evidence was abundantly present in this case. The appellant and McEachin drove together to 3505 Woodland Avenue. McEachin was the driver. Both men got out of the car and approached the building. They had no apparent business there, as they simply stood outside drinking and smoking for several minutes. As the murder victim approached on his bicycle, however, McEachin deliberately went to the car and turned on the ignition. The appellant stepped out and shot the victim at least three times. The appellant then jumped in the waiting car and he and McEachin together proceeded immediately "to get out of Dodge." As a predicate for a reasonable inference, that concert of action speaks for itself. The conduct would have been inexplicable without some at least tacit agreement between them.

Precisely what was said between the appellant and McEachin we do not know, but we do know that Detective Beauregard's search of the appellant's cellphone revealed that on the day of the shooting, there were eighteen cell phone messages between the appellant and McEachin, both before and after the shooting. There was at least an abundant opportunity for the two of them to have discussed both what was about to happen and what had already happened. This conspiracy was solidly even if inferentially established.

36

The task of providing a legally sufficient case, moreover, is not unduly onerous. In Pointer v. State, 157 Md.App. 1, 11, 848 A.2d 692 (2004), this Court succinctly set out the burden of persuasion.

> The test is not whether the evidence **should have** or **probably would have** persuaded the majority of fact finders but only whether it **possibly could have** persuaded any rational fact finder.

(Emphasis in original). Indeed, it possibly could have. See also State v. Mayers, 417 Md. 449, 466, 10 A.3d 782 (2010)("We defer to any possible reasonable inference the jury could have drawn from the admitted evidence and need not decide whether the jury could have drawn either inference from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence."); Pinkney v. State, 151 Md.App. 311, 329, 827 A.2d 124 (2003)(The appellant court thus must defer to the fact finder's "opportunity to assess the credibility of witnesses, weigh the evidence, and resolve conflicts in the evidence."); Benton v. State, 224 Md.App. 612, 629-630, 121 A.3d 246 (2015)("Circumstantial evidence, moreover, is entirely sufficient to support a conviction."); Anderson v. State, 227 Md.App. 329, 246-47, 133 A.3d 1266 (2016).

### The Phenomenon of Cumulative Error

In addition to his three particularized contentions, the appellant raises an additional inquiry of more generic import. It invites us into a fascinating but largely neglected small enclave of appellate review. Although of no avail to the appellant in this case, that enclave is worthy of brief note.

The entire phenomenon of cumulative or aggregated error only comes into play when an appellate court is dealing with the issue of harmless error. If a trial error is

37

determined to have occurred, the appellate judges may nonetheless be persuaded beyond a reasonable doubt that, even without the error, the verdict would still have been the same and that a reversal of the trial verdict would be draconically disproportionate to the error. What would the situation be, however, if the appellate court were dealing not with one finding of actual error but instead two-- or three or four? Reversal is a gestalt phenomenon. The ultimate decision as to reversibility is not made with respect to each error in a vacuum. The harms caused by more than one error in a case may cumulate before the ultimate decision on harmlessness is made. It is the told prejudicial impact that we measure, not the source or sources of the impact. Two or more fractions may add up to be more than a whole. As the appellant here expressed his argument:

> But <u>even if the Court were to find that those errors, taken individually, were harmless, their cumulative effect was not</u>. As this Court has held, "[i]n the case of two or more findings of error, <u>the cumulative prejudicial impact of the errors may be harmful even if each error, assessed in a vacuum, would have been deemed harmless</u>." <u>Muhammad</u>, 177 Md.App. at 325. In other words, "[w]here the prejudice… is fractional, the fractions may add up." <u>Id.</u>

(Emphasis supplied.)

In <u>Bowers v. State</u>, 320 Md. 416, 578 A.2d 734 (1990), the Court of Appeals was reviewing the decision of a post-conviction hearing dealing with the alleged inadequacy of counsel. Judge William Adkins wrote for the Court in holding that a series of smaller inadequacies added up to a case of constitutional inadequacy of counsel.

> We think <u>the numerous lapses</u> we have recounted are sufficient, <u>taken all together</u>, to <u>show inadequate performance</u>.
> …
> Consistent with the test in <u>Strickland</u> we can and do say, however, that all of these shortcomings leave us convinced that but for counsel's errors the result of the trial might well have been different.

The post-conviction judge thought otherwise, but his approach was to consider each charge of deficient performance and consequent prejudice, and to decide that no one charge alone was serious enough to meet the Strickland tests. That approach was incorrect. It is necessary to look at the trial as a whole. Strickland, 466 U.S. at 695-696, 104 S.Ct. at 2069, 80 L.Ed.2d at 698-699; Harris, 303 Md. at 701, 496 A.2d at 1082.

Even when individual errors may not be sufficient to cross the threshold, their cumulative effect may be.

320 Md. at 436. (Emphasis supplied.) The Court of Appeals concluded:

We hold that the cumulative effect of [counsel]'s actions and non-actions was enough to establish that his representation of Bowers did not meet constitutional muster.

320 Md. at 437. (Emphasis supplied.)

In Williams v. State, 342 Md. 724, 679 A.2d 1106 (1996), the Court of Appeals found that several errors had occurred in the course of a criminal trial. Judge Chasanow concluded for the Court:

Given the cumulative effect of these errors, we cannot conclude beyond a reasonable doubt that the jury's verdict was not influenced. Thus, we must reverse Williams's convictions and remand this case for a new trial.

342 Md. at 755. (Emphasis supplied.)

In Muhammad v. State, 177 Md.App. 325, 934 A.2d 1059 (2007), this Court analyzed this phenomenon of cumulative error at some length.

The contention is one that is increasingly voguish, and it deserves some analysis. "Cumulative error" is a phenomenon that exists only in the context of harmless error analysis. More precisely, it exists only in the context of multiple findings of harmless error. In the case of two or more findings of error, the cumulative prejudicial impact of the errors may be harmful even if each error, assessed in a vacuum, would have been deemed harmless. Where the prejudice from each of two or more errors is fractional, the fractions may add up.

39

(Emphasis supplied.)

The Muhammad analysis then went on to make clear what many defendants blithely ignore when making a cumulative error argument. The unit for cumulation for a cumulative error argument is judicially-found error, the actual subject for a harmless error analysis, and not a mere claim of error or an argument for error in the absence of a clear finding in that regard. Our analysis went on, 177 Md.App. at 325:

> Each fraction of prejudice, however, is contingent on an undergirding finding of error. It is in this regard that many promiscuous claims of cumulative error go awry.
>
> In a case involving two or more errors, the thing that may cumulate is the prejudicial effect of two or more actual findings of error, not the effect of two or more mere allegations of error. There must first be error before there is any prejudicial effect of that error to be measured. With respect to each of the appellant's contentions of individual error, we have held that there was no error. Self-evidently, there was no prejudicial impact to cumulate. Eight times nothing is still nothing.

(Emphasis supplied.) See also Colvin-el v. State, 332 Md. 144, 180, 630 A.2d 725 (1993)(where claims individually have no merit, there is no merit to the argument that the "whole exceeds the sum of its parts.").

Contended or uncontended, preserved or unpreserved, the appellant herein has claimed error in five regards. We have looked directly at the claim in two of those cases and found no merit. We have looked, purely arguendo, at the claims in the other three instances and found no hypothetical merit. Our conclusion, therefore, echoes the conclusion of Judge Chasanow in Gilliam v. State, 331 Md. 651, 686, 629 A.2d 685 (1993):

> This is not a case where the cumulative effect of numerous interrelated errors in aggregate amount to inadequate representation. This is more a case of the mathematical law that <u>twenty times nothing is still nothing</u>.

(Emphasis supplied.) In our case of claimed cumulative error, our computation is more modest than in <u>Gilliam v. State</u> but mathematically indistinguishable:

**Five times nothing is still nothing.**

 

 

 

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0436

September Term, 2019

_____


MALCOLM JORDAN

V.

STATE OF MARYLAND

Leahy,
Shaw Geter,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),

JJ.

Concurring Opinion
by Leahy, J.

_____

Filed:  July 14, 2020

42

The cogent legal analysis of the majority I do not question. I see the potential prejudicial effect of the contested evidence on the jury, however, and while this may have no bearing on the outcome of this appeal, it requires that I write separately to endorse Appellant's argument as worthy of our consideration.

Appellant's first and primary contention is that the trial court erred "by allowing the jury to watch an unredacted police interview in which: a detective stated that suspects normally plead guilty; and a key witness discussed her fears for her safety, prompting one juror to ask the court whether the jury should also be afraid for its safety[.]" (App. Br. 2). Appellant contends that "the improperly admitted evidence [] created a risk that the jury convicted Jordan in order to protect a frightened witness; caused the jurors to weigh their own safety in rendering a verdict; and implied that Jordan was dangerous and thus likely guilty." (App. Br. 15). Although the record does not reflect proper objections to the admission of the "improperly admitted evidence," we sometimes, albeit rarely, address the merits of an unpreserved issue. Md. Rule 8-131(a). *See also Robinson v. State*, 410 Md. 91, 103-04 (2009) ("[T]he word "ordinarily" [in Rule 8-131(a)] has the limited purpose of granting to the appellate court the prerogative to address the merits of an unpreserved issue, in the appropriate case. Such prerogative to review an unpreserved claim of error, however, is to be rarely exercised and only when doing so furthers, rather than undermines, the purposes of the rule."); *Jones v. State*, 379 Md. 704, 714 (2004) ("Although the interests of fairness generally are furthered by requiring the issues to be brought first to the attention of the trial court so that the trial court may pass upon it in the first instance, the appellate court has the discretion to excuse the default and consider the issue.").

43

Appellant's unpreserved challenge to the admission of the 40-minute video of Linda Phillips's police interview highlights her statements concerning her fear for her safety. In the video, Ms. Phillips asked the detective questioning her whether her identification would remain anonymous. The detective assured her that it would, explaining that the only way the individual she identifies would find out is if the case ever went to court, and offered that "most of the time these people plea out. So when they plea they never hear, they never know anything. They just accept the plea and go to jail." After Ms. Phillips identified Appellant in the photo array, the detective returned to Ms. Phillips's concern about anonymity, and offered, "I definitely know you are concerned about your safety, okay, and I completely understand that," and "if we think that there is, you know, a situation that you are in that you shouldn't be in that is going to be dangerous for you and your three kids we'll take care of that, we'll move you immediately, okay." (App. Br. 7). Ms. Phillips responded, "more reason to get out of there[.]" Subsequently, the detective asked whether Ms. Phillips's neighborhood was "historically violent," to which Ms. Phillips answered, "Yes . . . [p]eople keep on dying, a man was shot by the car dealership[.]" (App. Br. 7).

After the video was published to the jury, the court took a recess. When the proceedings resumed, the judge read counsel three notes that the judge had received from the jury, including one that asked, "As jurors, should we be concerned about our safety on this trial?" The court responded, without objection, "The answer is no, you don't have to be concerned."

The Court of Appeals has instructed that we should exercise our discretion to review an unpreserved claim of error "only when it is clear that it will not work an unfair prejudice

44

to the parties or to the court." *Jones*, 379 Md. at 714. "Unfair prejudice may result, for example, when counsel fails to bring the position of her client to the attention of the trial court so 'that court can pass upon and correct any errors in its own proceedings.'" *Robinson*, 410 Md. at 104 (quoting *Jones*, 379 Md. at 714). In this case, after seeing the video, jurors asked the judge whether they, too, should be concerned for their safety.

Appellant contends on appeal that the trial court abused its discretion when it did not *sua sponte* conduct a *voir dire* examination of the jurors to ascertain whether their fears for their safety could influence their verdict. (App. Br. 17). According to Appellant, the jury note expressing concern for the jury's safety proved that it was error to permit the jury to watch the unredacted police interview.

I agree with the majority that these arguments fail on appeal. The objection made at trial to showing the jury the entire unredacted video did not preserve the contentions now raised on appeal, and trial counsel never objected to the court's response to the jury note or requested *voir dire* or requested a mistrial on those grounds. As the Court of Appeals instructed in *Sifrit v. State*, to accept Appellant's arguments "we would have to require trial courts to imagine all reasonable offshoots of the argument actually presented to them before making a ruling on admissibility." 383 Md. 116, 136 (2004). But, for me at least, it was a closer call to consider Appellant's alternative request that we consider, even if not preserved, whether his right to a fair and impartial jury was so seriously compromised by the evidence presented on the 40-minute video that we should exercise our discretion to recognize plain error.